[L.A. No. 31136. May 8, 1980.]

UNITED STATES BORAX & CHEMICAL CORPORATION,
Plaintiff and Respondent, v.
JOHN C. MITCHELL, as Supervisor, etc., et al., Defendants
and Appellants.

COUNSEL

Vizzard, Baker, Sullivan & McFarland, Allan H. McFarland and Jerold L. Turner for Defendants and Appellants.

Bultman, Bianchi & Kelly, M. Glenn Bultman, O'Melveny & Myers, Bennett W. Priest and Frederick A. Richman for Plaintiff and Respondent.

OPINION

**TOBRINER, J.**—Plaintiff United States Borax and Chemical Corporation (Borax) instituted the present action in August 1975 against Kern County and the Kern County Board of Supervisors seeking to obtain a refund of taxes paid under protest. The taxes at issue were levied after the board of supervisors approved an increase in the valuation of certain mineral interests above the valuation of such interests initially set forth on the county's 1974-1975 assessment roll. Although the board of supervisors authorized the increase as a "correction" of a clerical error under former section 4831, subdivision (a) of the Revenue and Taxation Code, Borax contended in its refund action that the alteration was not so authorized. The superior court ruled in Borax's favor, and the county defendants now appeal from the judgment.

We conclude, as we shall explain, that the judgment must be affirmed. Under the terms of former section 4831, subdivision (a), the assessed valuation of property appearing on a county's assessment roll could be "corrected" pursuant to the procedure set forth in that statute only when it could be "ascertained *from an inspection of the property, the records of the assessee, or from the roll or any papers in the assessor's office* what was intended" by the assessor. (Italics added.) As we

shall see, in the present case an examination of the sources of information specified in that section does not reveal the existence of any clerical error, or, indeed, any error at all, that would have warranted "correction." Accordingly, the trial court properly concluded that the board of supervisors erred in authorizing the alteration of the assessment roll and in levying additional taxes.

1. *The facts and proceedings below*

In May 1974, Leon Moynier, a principal appraiser with the Kern County Assessor's office, computed the value of a mineral deposit of sodium borate (the Boron interest) owned by Borax in Kern County near the City of Boron. In evaluating this property interest, Moynier utilized the "capitalization of income" approach, which involved a calculation of the income that Borax could expect to realize from the Boron interest over its 30-year productive life and the conversion of this income stream into an estimate of present value. The valuation, of course, was to serve as a basis for computing the tax on the Boron interest.

One phase of the valuation process is pertinent to the present case. In reducing future income to present worth, the assessor deducts a certain amount from anticipated annual income to allow for capital expenditures by the assessee for upkeep of the plant, equipment, and machinery. Since the assessor calculates future income in accordance with his estimate of future production levels, he must allow the assessee enough "replacement capital" to maintain those projected levels. The effect of this replacement capital allowance, of course, is to reduce the amount of the fair market value figure on which the tax is ultimately based.

The life span of the Boron interest which concerns us here extends from 1973-2003. In valuing that interest, Moynier determined that, to maintain projected production levels through 2003, Borax should be allowed a total of $3,475,000 in replacement capital for the years 1974-1977. Because Moynier's ultimate valuation of the Boron interest would rest on his valuation of *all* mineral interests owned by Borax, this replacement capital figure covered anticipated expenditures not only for Boron but also for an interest owned by Borax in Los Angeles County (the Wilmington interest). Moynier allowed no replacement capital after 1977 for either interest.

Based on his estimate of future income over the life of the Boron interest, with replacement capital as a factor in that estimate, Moynier valued the interest at $34,861,000. Although Moynier was not aware of it at the time, this figure closely paralleled the valuations of this mineral interest made by his predecessor, Robert Campbell-Taylor, in previous years.

Moynier sent a copy of his calculations, dated "5/15/74," to Borax. After reviewing Moynier's figures, Borax officials concluded that the replacement capital allowances utilized by Moynier were inadequate. In early June, company officials met with Moynier and provided him with a revised estimate for both plants in the form of two documents: one incorporating the new replacement capital figures onto the overall value calculation for the Boron interest, and one detailing the anticipated expenditures for which replacement capital would be needed.

The former document allowed a total of $60,025,000 for Boron interest replacement capital from 1974-1978, and a total of $5 million for Wilmington interest replacement capital for those years. Most importantly, the document included a "composite present worth factor" of 3.6373 under the 1978 heading. This figure indicated that Borax had allowed for annual replacement capital at the 1978 levels ($3,776,000 for Boron, $1 million for Wilmington) for each year through 2003, i.e., throughout the remaining life of the interests. As a consequence, in part, of this increased allowance for replacement capital, Borax calculated the fair market value of its Boron interest as $22,480,000, rather than the $34,861,000 that Moynier had originally suggested.

Moynier adopted the Borax calculations in their entirety. Based on the fair market value of $22,480,000, an assessed value of $5,620,000 for the Boron interest was entered on the 1974-1975 assessment roll, and the tax was calculated accordingly. Borax paid that tax in full.

Early in 1975, Moynier's predecessor, Campbell-Taylor, reviewed the Borax assessment rolls (in testifying, Campbell-Taylor explained the reason for this review as his continuing interest in a property he had previously assessed). In the process, he noticed that the 1974-1975 fair market value for the Boron interest was substantially lower than the valuations made in previous years. He then reviewed the documents submitted by Borax in June 1974, and ascertained that replacement capital had been allowed for both interests for each year from

1974-2003. Moynier, as he later testified, had misunderstood the Borax calculations and assumed that the Boron allowances ended in 1978, with only the Wilmington allowances extending through 2003.

Pursuant to Revenue and Taxation Code section 4831, subdivision (a), the assessor then undertook to correct Moynier's "error," i.e., to confine the Boron interest replacement capital allowances to the years 1974-1978 and thus increase the fair market value of the interest to $34,292,800. The assessed value on the roll was then increased by $2,953,200 and Borax was notified of the change.

With the notice of the increased assessment, the assessor sent Borax copies of two sheets of calculations prepared by Campbell-Taylor in an attempt to explain the basis for the change (which the assessor termed a "correction"). The first sheet contained a detailed analysis of the calculations submitted by Borax in June 1974. The second sheet contained the figures which Moynier *thought* he was accepting when he adopted the Borax documents. Neither sheet contained any mathematical error.

Borax notified the assessor of its objection to the proposed "correction," and the board of supervisors, pursuant to Revenue and Taxation Code section 4836, conducted a hearing on the dispute. Evidence admitted at the hearing included the calculations which Moynier originally submitted to Borax in 1974; the documents increasing the replacement capital allowances which Borax gave Moynier in June 1974; the sheets prepared by Campbell-Taylor in 1975 to explain the assessor's "correction"; and oral testimony from Moynier and Campbell-Taylor regarding Moynier's understanding of the Borax figures.

According to Moynier's testimony and the explanatory sheets prepared in 1975, Moynier recognized at all times that the Borax calculations yielded a fair market value some $12 million lower than his original figure. He initially attributed that reduction, however, to the increased replacement capital for the Wilmington interest (among other factors), and failed to perceive in June 1974 that replacement capital had been extended beyond 1978 for the Boron interest as well as for the Wilmington interest. He testified that he never intended to allow replacement capital for the Boron interest beyond 1978, and that if he had understood that the decrease in fair market value reflected a post-1978 allowance he would not have accepted the Borax figures.

At the conclusion of the hearing, the board approved the assessor's correction of what the board termed the "clerical error" on the assessment roll. The county then sent Borax a supplemental tax bill for $294,033.61, based on the increase in the assessed value of the Boron interest. In July 1975 Borax paid the tax under protest and initiated this action to recover it.

At trial, Borax contended that the correction of the assessment roll was improper on three separate grounds. Borax contended (1) that the original 1974-1975 assessment roll valuation was not in error in any respect and reflected an accurate estimate of the fair market value of the mineral interest under a capitalization-of-income approach, (2) that even if the assessment roll figure was in error, the error was an error "in judgment as to value," which could not be corrected under section 4831, subdivision (a), and finally, (3) that even if a correctible clerical error had occurred, such error was not ascertainable from the limited evidentiary sources which could be examined under the provisions of former section 4831, subdivision (a). The trial court agreed with Borax's contention that the alteration in assessed valuation in this case was not permissible under former section 4831, subdivision (a) and entered judgment in favor of Borax. The county defendants now appeal.[1]

2. *Under former section 4831, subdivision (a), a correction of the assessment roll was not authorized in this case because no discrepancy between the original assessment and the assessor's intent can be ascertained from the limited sources specified in the statute.*

[1]As a threshold matter, defendants contend that the present refund action should be barred on the ground that Borax failed to seek relief from the county board of equalization and thereby allegedly failed to exhaust an available administrative remedy. (See, e.g., *Security-First Nat. Bk. v. County of L.A.* (1950) 35 Cal.2d 319, 320-321 [217 P.2d 948].) Although the county board of equalization enjoys broad authority to entertain challenges to the *valuation* of taxable property (see Cal. Const., art. XIII, § 16), defendants cite no statute or case law which supports their contention that the board of equalization has jurisdiction to determine the propriety of a correction of an assessment roll under section 4831, subdivision (a). On the contrary, section 4836 provided that, as to corrections, the taxpayer's administrative hearing is held before the county board of supervisors rather than the county board of equalization; in addition, section 4836 specifically provides that "[t]he decision of the board of supervisors in this matter is final." None of the past decisions dealing with corrections of assessment rolls have suggested that after a hearing by the board of supervisors, a taxpayer must seek further administrative relief from the board of equalization before filing a refund action. (See, e.g., *Southwest Land Co. v. Los Angeles Co.* (1920) 46 Cal.App. 9, 10-11 [188 P. 575].)

At the time of the events described above, section 4831, subdivision (a), provided in relevant part: "When it can be ascertained from an inspection of the property, the records of the assessee, or from the roll or any papers in the assessor's office what was intended, or what should have been assessed, defects in description or form or clerical errors of the assessor...or other errors of the assessor not involving the exercise of judgment as to value which result in the entry on the roll of assessed values other than those intended by the assessor,...may be corrected under this article at any time after the roll is delivered to the auditor and prior to the expiration of four years after the making of the assessment which is being corrected."

■ In general, this statute was intended to provide the assessor with a simple and efficient mechanism for correcting clerical defects or errors that were discovered after the assessment roll had been completed and delivered to the auditor. Unlike the escape assessment procedure embodied in Revenue and Taxation Code section 531 et seq., through which an increase in an improperly low assessment can be secured whether the underassessment was due to a clerical error, an error in judgment, or otherwise (see *Bauer-Schweitzer Malting Co. v. City and County of San Francisco* (1973) 8 Cal.3d 942 [106 Cal.Rptr. 643, 506 P.2d 1019]; *Hewlett-Packard Co. v. County of Santa Clara* (1975) 50 Cal.App.3d 74 [123 Cal.Rptr. 195]), the correction procedure of section 4831 was reserved for errors of a clerical nature which did not involve the assessor's "judgment as to value." Moreover, under the terms of former section 4831, subdivision (a)—the provision which governs the present case—the correction of even clerical errors pursuant to this procedure was proper only when it could be ascertained from an inspection of certain designated sources that such an error had in fact occurred.

The parties in the instant case vigorously contest whether the alleged error in the 1974-1975 assessment roll constituted only a clerical error correctible under section 4831 or an error "involving the exercise of judgment as to value" which could not be remedied pursuant to that statute. Defendants argue that Moynier's testimony before the board of supervisors demonstrates that the error was strictly clerical or "technical" in nature, reflecting the appraiser's simple misinterpretation of the calculations provided by Borax. Borax, in response, argues that Moynier's decision to substitute the Borax replacement capital figures and resulting fair market value for his original 1974 estimates inherently in-

volved the "exercise of judgment as to value" and cannot be dismissed as mere clerical error.

We need not, however, determine the proper characterization of the error, if any, in the assessment roll valuation in the instant case. As we shall explain, even assuming that the error in this case was clerical in nature, we have concluded that the trial court properly decided that no correction was permissible. We have so determined because the existence of any such error was not ascertainable from "an inspection of . . . any papers in the assessor's office" or any of the other sources enumerated in the statute.

We begin our analysis by focusing upon the crucial statutory language. The introductory clause of former section 4831, subdivision (a), authorized a correction of the assessment roll only "[w]hen it can be ascertained from an inspection of the property, the records of the assessee, or from the roll or any papers in the assessor's office what was intended, or what should have been assessed. . . ." This introductory clause has recently been deleted from the statute,[2] and hence will not limit the correction of clerical errors in the assessment roll in the future; at the time of the attempted correction, however, the clause limited the sources of evidence which could be consulted to ascertain whether a correctible error had been made.

The early case of *Southwest Land Co.* v. *Los Angeles Co.* (1920) 46 Cal.App. 9 [188 P. 575] clearly illustrates how the narrow evidentiary focus of former section 4831, subdivision (a) operated to restrict the correction of errors that, when viewed without evidentiary limitations, appeared to constitute clerical error. In *Southwest Land*, the county board of supervisors approved a correction of an assessment roll entry on the basis of an assessor's oral testimony that, after he informed his clerk that he intended to value the property in question at $100,280, the clerk erroneously entered the figure of $10,280 on the tax roll. At the time the correction in that case was made, section 3881 of the Political

---

[2] In September 1979, during the pendency of the appeal in this case, the Legislature amended section 4831, subdivision (a), deleting the evidentiary limitations formerly embodied in the statute. Section 4831, subdivision (a) now provides in relevant part: "Any error of the assessor resulting in the entry of incorrect values on the roll may be corrected under this article. The correction may be made at any time after the roll is delivered to the auditor but shall be made within four years after the making of the assessment which is being corrected. This section does not apply to the following: (1) Errors involving the exercise of value judgments; or (2) Escape assessments caused by the assessee's failure to report the information required by Article 2 (commencing with section 441) of Chapter 3 of Part 2."

Code, the predecessor of section 4831 of the Revenue and Taxation Code, provided in relevant part that "[c]lerical omissions or errors...in any assessment-book, *when it can be ascertained from the assessment-book or from the assessor's maps or block-books, or from the list furnished by the property owner, what was intended to be assessed* ...may...be supplied or corrected by the assessor at any time after the assessment was made, prior to the sale for delinquent taxes...." (Italics added.)

In an action brought by the property owner challenging the increased assessment, the court in *Southwest Land* invalidated the change, stating: "The validity of [the] change cannot be upheld...unless the board was authorized to go beyond the data which appeared on the books, and take direct testimony proving that the assessor instructed his clerk to make an entry showing a valuation different from the valuation as actually entered. *But this would be an assumption of authority in excess of the limitation prescribed by section 3881....* [T]he manifest intention of the legislature was to more narrowly define the terms of the grant of power, so that after equalization no changes might be made except those of a purely clerical or formal nature...*and then not unless the fact that there was an error could be ascertained from the sources named.*" (Italics added.) (46 Cal.App. at pp. 13-14.)

Subsequent to the *Southwest Land* decision, the correction statute was broadened to permit the ascertainment of error from "any papers in the assessor's office" as well as from the sources enumerated in the earlier statute. At the time of the "correction" in this case, however, section 4831 still confined its operation to errors which were disclosed by such papers or other named sources. If the alleged clerical error could not be ascertained from those sources, the error was not one that could be corrected under former section 4831.

In the instant case, the only evidence presented to the board of supervisors from the sources listed in the statute were two papers which were in the assessor's office at the time the assessment roll was prepared: (1) the worksheet of Moynier dated "5/15/74" and (2) the calculations submitted by Borax in June 1974.[3] The county concedes that no error is ascertainable from either document considered alone, but argues that

---

[3] Past cases make it clear that former section 4831's reference to "any papers in the assessor's office" encompassed papers that were in the assessor's office at the time the challenged assessment roll was prepared. (See *Pasadena University v. Los Angeles Co.* (1923) 190 Cal. 786 [214 P. 868].)

an error does become apparent when the two documents are considered together and compared, in that Moynier's original conclusion as to value reflected a capital allowance only for the years 1974-1977, while the Borax conclusion reflected, in part, an allowance for each year from 1974-2003.[4]

A comparison of the two documents, however, does not reveal any error on the assessment roll. Both the Moynier and the Borax calculations are accurate in every respect; they simply proceed from different premises regarding the amounts of replacement capital necessary to maintain projected income flows at the Boron plant. The defendants do not claim that the Borax figure contains any mathematical error, or that the analysis utilized by Borax represents a misapplication of generally accepted principles of the capitalization of income methodology.[5] It is true that the assessment roll corresponds to the Borax figures rather than to Moynier's original calculations; that fact, however, does not reveal any error in the roll but instead simply indicates that the assessor decided to adopt Borax's method of calculation rather than his own initial figures. (See, e.g., *Kuhlemeier* v. *County of Los Angeles* (1935) 2 Cal.2d 257 [40 P.2d 828].)

Defendants additionally argue, however, that even if an error in the assessment roll is not apparent from the face of the two documents in the assessor's office, the board of supervisors could properly find such an error on the basis of the oral testimony of Moynier and Campbell-Taylor discussing these documents. While defendants acknowledge, in deference to the holding of the *Southwest Land* case discussed above, that such testimony was not directly admissible to prove Moynier's intent at the time of the initial assessment, they argue that the testimony—and the additional worksheets prepared by Campbell-Taylor in March 1975—could properly be considered "to resolve the differences between the valuation calculated on Moynier's original worksheet and that shown on the assessment roll."

[4]Seizing upon the statement in one of the trial court's findings of facts that no error was ascertainable from "either" of the two documents, the county claims that the trial court erroneously considered the documents "individually" rather than "collectively." Viewing the findings of fact as a whole and construing them liberally in support of the judgment, as we are required to do on appeal (see, e.g., *De Vrahnos* v. *George* (1962) 203 Cal.App.2d 210, 221 [21 Cal.Rptr. 481]), we conclude that the findings do not support the county's tenuous suggestion that the court evaluated each document in isolation.

[5]Indeed, the Borax calculations were prepared in accordance with the method for determining the appropriate "capital allowance" or "capital requirements" set forth at page 560 of the Assessor's Handbook prepared by the Assessment Standards Division of the California State Board of Equalization.

As we have seen, however, the difference between the assessment roll figure ($22,480,000) and that on Moynier's worksheet ($34,861,000) was fully explained by the "paper in the assessor's office" containing the figures submitted by Borax. Thus, although oral testimony and other extrinsic evidence may have been admissible to explain the content of the documents in the assessor's office at the time of the 1974-1975 assessment (cf. *Pacific Gas & E. Co.* v. *G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]; *Delta Dynamics, Inc.* v. *Arioto* (1968) 69 Cal.2d 525 [72 Cal.Rptr. 785, 446 P.2d 785]), the testimony in this case did not demonstrate any error or disparity between the Borax calculations and the assessment roll valuation.

Accordingly, while the assessment roll figure may have been the product of Moynier's unconscious mistake and, to that extent, may not have corresponded to Moynier's subjective "intent," we conclude that the trial court properly determined that any such diversion from "what was intended" could not in this case "be ascertained from an inspection of the property, the records of the assessee, or from the roll or any papers in the assessor's office. . . ." Under these circumstances, the court correctly held that the increased assessment was not authorized.[6]

The judgment is affirmed.

Bird, C. J., Clark, J., Richardson, J., and Manuel, J., concurred.

**MOSK, J.**—I dissent.

At a time when local government is desperately in need of revenue, the majority disapprove the assessment of the county assessor and the review thereof by the county board of supervisors, and improvidently

---

[6]Although defendants additionally claim that in order to obtain a refund, Borax should be required to demonstrate that it cannot "in good conscience and equity" be made to pay the supplemental tax, defendants cite no authority for such a requirement, and under the terms of section 4831, the validity of the correction does not turn on such matters.

As briefly suggested above, if Borax's property was improperly underassessed by reason of an error not correctible under section 4831, the assessor could have obtained an increase in assessment pursuant to the escape assessment procedures. Although section 532 provides in general that such an escape assessment "shall be made within four years after July 1 of the assessment year in which the property escaped taxation or was underassessed," we need not decide in the instant case whether this four-year statute may properly be tolled during the pendency of a taxpayer's action challenging the validity of an increase in assessment pursuant to section 4831. (Cf. *Elkins* v. *Derby* (1974) 12 Cal.3d 410 [115 Cal.Rptr. 641, 525 P.2d 81, 71 A.L.R.3d 839].)

award to the United States Borax and Chemical Corporation (Borax) a bountiful windfall of $294,033.61, plus interest. This sum must be paid out of county resources. In order to reach their result, the majority apply an unreasonably narrow interpretation of Revenue and Taxation Code section 4831, subdivision (a); in doing so they overlook both the long accepted presumption that an assessment is valid (*Western Union Tel. Co.* v. *Los Angeles* (1911) 160 Cal. 124, 127 [116 P. 564]; *County of Ventura* v. *Channel Islands State Bank* (1967) 251 Cal.App.2d 240, 245 [59 Cal.Rptr. 404]), and the universal rule that deviations are to be viewed "with a hostile eye." (*Oklahoma Tax Comm'n* v. *U.S.* (1943) 319 U.S. 598, 612 [87 L.Ed. 1612, 1621, 63 S.Ct. 1284], Murphy, J., dis.)

With constant repetition the majority maintain that there was no "clerical error," within the meaning of Revenue and Taxation Code section 4831, and it is apparent from their opinion that they equate a clerical error with inexact mathematical computation. But the statute is not so limited in effect. Legislative words are not inert; they derive vitality from their purpose, particularly in the field of revenue taxation which provides nourishment for the very existence of government.

In addition to covering clerical errors, the statute provides that "When it can be ascertained from . . . the roll or *any papers in the assessor's office* what was *intended*, or *what should have been assessed*, defects in description or form, *or* clerical errors . . . *or other errors of the assessor* not involving the exercise of judgment as to value *which result in the entry on the roll of assessed values other than those intended by the assessor* . . . may be corrected . . . at any time . . . prior to the expiration of four years . . . ." (Italics added.)

Thus we are not concerned here with merely a purported clerical error or mathematical miscalculation. The issue is whether it can be ascertained from *any papers in the assessor's office* what was *intended* and *what should have been assessed*. There is no question that the correction was made prior to the expiration of four years.

In 1974 Leon Moynier, new as the principal appraiser in the Kern County Assessor's office, undertook for his first time the assessment of mineral interests at Boron owned by Borax. For prior years the valuation had been made by his predecessor, Robert Campbell-Taylor.

Moynier prepared a worksheet, dated May 15, 1974, determining the valuation of the Borax mineral interests to be $34,861,000, and the sum of $3,475,000 to be allocated for replacement capital for the maintenance of the plant and equipment for the years 1974-1977 and no replacement capital allowance after 1977. This was obviously a paper in the assessor's office within the meaning of section 4831.

Borax submitted to Moynier its own worksheet, which reduced the value of the mineral interests by approximately one-third to $22,480,000, established the replacement capital at $3,776,000 and provided $3,776,000 per year for the remaining life of the property extending to the year 2003. Moynier submitted tax bills to Borax based entirely on the Borax self-serving figures. This, it subsequently developed, was in error.

Moynier testified he was unaware that the Borax-prepared valuation was substantially below the valuations for prior years; manifestly Borax was well aware of that fact when it submitted the lower figures to the new principal appraiser. The following February—well within the statutory limitation of four years—Campbell-Taylor observed the vast discrepancy between the 1974 valuation of Borax mineral interests and valuations of previous years. He called this to the attention of Moynier and a correction was made on the assessment roll to reflect a full fair market value of $34,292,800. This resulted in a tax bill revised upward by $294,033.61, which Borax paid under protest.

At the hearing before the Kern County Board of Supervisors, pursuant to section 4836, Moynier testified he was unaware, prior to being so advised by Campbell-Taylor, that the Borax figures were inconsistent with higher valuation figures for the previous years, as shown in the assessor's office records. He testified he had intended to increase the capital replacement figure as reflected in his original worksheet and that he did not intend to allow for any capital replacement after 1977. On the basis of that testimony and the original worksheet, the board upheld the corrected assessment. This was a proper exercise of its discretion and as provided in section 4836 "the matter is final."

From the foregoing I find circumstances that fit within the perimeter of section 4831. The original Moynier worksheet of May 15, 1974, comprises "papers in the assessor's office." The submission to the auditor of assessment figures substantially lower than those of previous years, unknown to Moynier but known to Borax, constituted "other er-

rors of the assessor" and resulted in the entry of "values other than those intended by the assessor." The additional tax was a correction made "prior to the expiration of four years after the making of the assessment."

The foregoing alone was sufficient to sustain the assessor and the board of supervisors, and to require a reversal of the judgment to the contrary. In addition, moreover, there was a serious error committed at trial. The court improperly, and prejudicially, imposed strict limitations on the introduction of parol evidence. Section 4831 refers to ascertaining "what was intended, or what should have been assessed." Since it is obvious that intent is subjective, testimony by Moynier as to his intent should have been admitted. Cases holding to the contrary relied upon by Borax involved mere mathematical errors. This is true of *Southwest Land Co.* v. *Los Angeles County* (1920) 46 Cal.App. 9 [188 P. 575], and of *Pasadena University* v. *Los Angeles Co.* (1923) 190 Cal. 786, 793 [214 P. 868] and *County of San Luis Obispo* v. *White* (1891) 91 Cal. 432, 439 [24 P. 864, 27 P. 756].

Of equal importance to the foregoing statutory interpretation issue is the serious policy question in this case. Shall a giant mining industry escape its proper share of taxation, not only on the present bases but on figures running until the year 2003, on a mere technical error for the correction of which the statute was obviously designed? The answer should be in the negative. Devices that provide an undeserved bonanza to one taxpayer will "always create inequities. Those not exempted must, in the end, bear an additional burden or pay more than their share." (*Pollock* v. *Farmers' Loan & Trust Co.* (1895) 157 U.S. 429, 595 [39 L.Ed. 759, 824, 15 S.Ct. 673], Field, J., conc.) Such is the fate of Kern County taxpayers under the majority opinion.

I would reverse the judgment.

Newman, J., concurred.