[Crim. No. 34176. Second Dist., Div. Five. June 4, 1980.]

THE PEOPLE, Plaintiff and Appellant, v.
EDMUND CHRIS MARTINEZ, Defendant and Appellant.

COUNSEL

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Howard J. Schwab, William R. Weisman, Deputy Attorneys General, Stanley M. Roden, District Attorney, and Patrick J. McKinley, Deputy District Attorney, for Plaintiff and Appellant.

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Therene Powell, Deputy State Public Defender, for Defendant and Appellant.

## OPINION

**STEPHENS, J.**—Defendant was charged in an information with burglary in violation of Penal Code section 459. The information also alleged that defendant had suffered one prior conviction and had served a term for that offense less than five years before the filing of the information. Trial by jury commenced on December 5, 1978. On December 8, the jury found defendant guilty of burglary in the second degree.

Defendant was denied probation and sentenced to state prison for the upper base term of three years. The prior felony conviction was stricken on the ground that a commitment to the California Rehabilitation Center (CRC) did not qualify as a "prior prison term" within the meaning of Penal Code section 667.5. Defendant received credit for 140 days previously spent in custody.

The People appeal from the order striking the prior felony conviction.

Defendant appeals from the judgment convicting him of burglary and sentencing him to the upper term of imprisonment.

## I

### FACTUAL BACKGROUND

Waldo E. Wolfe lived in a frame tract house on Veronica Springs Road in Santa Barbara. Because the house was surrounded by foliage and was lower than street level, it was not visible from the street. Before he retired, he had been a proprietor of a Mexican and Indian arts and crafts store. Now he continued to collect Indian artifacts, many of which he kept in his home. Mr. Wolfe lived alone; his wife resided in a rest home. He was becoming weaker, and his hearing and eyesight were poor.

On the afternoon of August 26, 1978, Mr. Wolfe left his house for one and one-half hours to two hours to attend an auction sale at Culinary Hall. When he returned home, his house had been ransacked and his possessions strewn all over the house. A rear window directly opposite the entry door from the dining room was open, and several Indian statutes that had been lined up in that window had been knocked to the

floor. He discovered that a large quantity of Indian jewelry (silver and turquoise necklaces and rings), three diamond rings and a diamond pendant were missing. A tan colored suitcase was also missing. Mr. Wolfe testified that the value of the property taken was between $20,000 and $30,000.

Alice Rypins also lived on Veronica Springs Road. Her home is on the same block on the same side of the street as Mr. Wolfe's (hereinafter sometimes referred to as Wolfe) home. At about 2:30 p.m. on August 26, 1978, while gardening on her front lawn, she saw a young man running with a tan or brown suitcase. The man appeared to be a Mexican and wore a long black ponytail.

A white four-door station wagon drove south on Rypins' side of Veronica Springs Road and stopped in front of her house. Two people were in the car. The station wagon had stopped beside the man with the suitcase. He threw the suitcase into the back seat and then got into the car. The man appeared to be angry. Rypins could hear him shouting at the people inside the car, but she couldn't understand what he was saying. The car drove off to the south and Rypins went into her house. She had seen the license number of the car; once inside her house, she picked up the first piece of paper she could find and wrote, "Mexican type with blue shirt, black ponytail; white station wagon, 410 RDW; Saturday, 2:30." The notation, "410 RDW" was the license number of the white station wagon.

Ms. Rypins testified that defendant was the man she saw on Veronica Springs Road. It was undisputed that defendant had worn a ponytail during the time period when the burglary occurred. At the time of his arrest, defendant told police that he was a Mexican.

The police found a footprint near the burglar's point of entry. The print was that of a shoe with a distinctive "railroad tie" pattern and an arrow design on the sole. Defendant's shoes were seized and were found to have the exact size, pattern and wear characteristics of the shoe that made the print near the point of entry.

The white station wagon with the license number "410 RDW" belonged to Cathy Martinez—defendant's wife. Defendant had on many previous occasions been seen in that car.

On August 28, 1978, defendant accompanied Detective James T. Lohse (Lohse) to police headquarters for questioning. He was placed in an interview room and was thereafter interrogated—first by Detective Thomas Murphy (Murphy) and, second, by Detective Lohse. Prior to trial, defendant moved to exclude the statements that he made to these two detectives.[1] At the hearing on the motion to exclude, the testimony of defendant sharply conflicted with that of his previous interrogators. Detective Murphy first interrogated defendant. It is agreed that Detective Murphy advised defendant of his *Miranda* rights and that defendant said that he understood those rights. It is also agreed that when Murphy asked if defendant wanted to talk about the burglary on Veronica Springs Road, defendant responded, "Yes."

At the hearing on the motion to exclude, Murphy testified that he then asked defendant if there was any way for the police department to get the property back. Defendant responded that he could get the property back, but it would probably take him about 24 hours. Detective Murphy then told defendant that he was going to be placed under arrest and was not free to leave. Defendant responded that if that were the case, he probably would not be able to get the property back. Murphy then left the interview room. According to his testimony, defendant said nothing else during the conversation.

Defendant's version of the conversation was different. After defendant received the *Miranda* warnings, he stated that he understood them and agreed to talk. Murphy asked him if he had committed the burglary on Veronica Springs Road. Defendant responded, "No." Because of his status as a police informant, defendant was afraid that if he went to jail he would be harmed or killed. He testified that he was "using everything I knew to weasle [*sic*] out of going to jail. . . . " When Murphy continued the questioning, defendant told Murphy that he had a "jacket" and was afraid of going to jail. When defendant used the term "jacket," he meant a "snitch jacket" which branded him a police informant. Defendant told Murphy: "Hey, let's make a deal, okay? If I go to jail, I am going to be hurt. All right. You give me twenty-four hours. I know a big handful of fences. You give me twenty-four hours; and it is

[1]We observe that defendant's brief has described facts concerning a conversation between Correctional Officer DeDios and defendant. Defendant's pretrial motion to exclude evidence of defendant's statements to DeDios was denied, and the evidence was admitted at trial. Defendant's brief offers no discussion concerning this evidence. We have reviewed this evidence and find no error in its admission.

possible the man that I find with all the stuff, that we can set up, or I can bring the stuff back; but I can't go to jail. Give me twenty-four hours, and I will do what I can about bringing the stuff back." Murphy then told defendant, "You must be misinterpreting what I am saying. You are under arrest. You are going to jail." The detective then left the room.

Defendant was next interrogated by Detective Lohse. Before Lohse entered the interview room, he conferred with Murphy, who advised him that defendant had waived his *Miranda* rights. After asking Murphy if it would be all right for him to speak with defendant, Lohse entered the interview room. For about three to five minutes thereafter he and defendant discussed their prior contacts. This conversation did not relate to any particular criminal acts of defendant for which he was a suspect. Detective Lohse, according to his testimony, then began to question defendant about a crime he called the "Turquoise Burglary." Lohse first asked whether or not the burglary was premeditated. When defendant shook his head from left to right, Lohse asked him if he was nodding "No" and defendant moved his head up and down. Then Lohse asked defendant if the burglary was planned, and defendant moved his head from left to right several times. Lohse then asked defendant if nodding his head was a reply to a question, and defendant moved his head up and down. Lohse also asked defendant if the first movement meant "No" and defendant again made a gesturing motion up and down.

Detective Lohse continued the interrogation by asking if defendant had been alone during the burglary. Defendant moved his head up and down several times. Next defendant was asked if he knew that the turquoise was worth $12,000; defendant then moved his head from left to right. Lastly, Lohse asked defendant if there were any others involved in the burglary; defendant moved his head from left to right. At that point Lohse terminated the interrogation.

Defendant's version of the exchange with Lohse was quite different. Defendant testified that when Lohse asked defendant "point-blank" about the burglary, defendant moved his chair back abruptly. "...I shook my head 'No.' And I went, 'Hey, you know,' you know, 'no way do I want to go. There's no way I am going to implicate myself in any crime.'" Defendant testified that he had just been read his *Miranda* rights, understood them, and sought to exercise them by ceasing verbal

communication and shaking his head, "No." Defendant testified that he continued shaking his head, "No," in response to all other questions asked by Lohse except for the question, "Do you understand you are saying 'No'?" When that question was asked, defendant moved his chair back and dropped his head down in disgust so that he may have appeared to have been nodding "Yes."

## II

### DEFENDANT'S CONTENTIONS ON APPEAL

A.  *Defendant's Statement to Detective Murphy.*

Defendant contends that the trial court erred in refusing to exclude his statement to Detective Murphy wherein defendant stated that it would take him 24 hours to recover the stolen property. Defendant objected to this testimony on the ground that its prejudicial effect far outweighed its probative value. That objection invoked the provisions of section 352 of the Evidence Code. He asserts initially that the trial court failed to weigh the probative value of the statement against its prejudicial impact before it ruled the evidence admissible. When evidence is challenged pursuant to section 352, the failure to weigh the probative value of the evidence against its prejudicial effect constitutes a prima facie abuse of discretion. (*People* v. *Ford* (1964) 60 Cal.2d 772, 801 [36 Cal.Rptr. 620, 388 P.2d 892].) He next asserts that had the court considered those factors, it would have been compelled to conclude that the prejudicial effect of defendant's statement substantially outweighed its probative value. The statement, defendant urges, has little if any relevance, because "it does not tend to establish that appellant stole the property himself." At the same time, he argues the statement is highly prejudicial, because it places "appellant in a criminal milieu by suggesting that he was sufficiently familiar with dealers in stolen property to be able to locate such property within twenty-four hours."

Both assertions may be dealt with at the same time. After defendant's counsel had argued the matter, the court stated that it was aware of conflicts in the evidence and thereupon adopted Detective Murphy's version of the exchange between defendant and Murphy. Under the circumstances of this case, the court had ample discretion to base its ruling on its disbelief of defendant's version. The only prejudice in ei-

ther version was defendant's own alleged statement that he knew "a big handful of fences."

Defendant's analysis of the statement he made to Murphy is premised upon a refusal to acknowledge the compelling inculpatory inferences which arise from the statement as reported by Murphy. Defendant's offer to recover the stolen property if given 24 hours had a strong tendency to show that he had access to or control over the property. In turn, the inference that he had access to or control over the property supported the additional inference that he took or aided in the taking of the property. "If the first inference is proper, a deduction of fact drawn from that inference is likewise proper provided it is not too remote or speculative." (*Dimond* v. *Caterpillar Tractor Co.* (1976) 65 Cal.App.3d 173, 181 [134 Cal.Rptr. 895].) There was no error in its admission.

On the other hand, defendant's assertion that his statement to Murphy was prejudicial because it imputed to him the character trait of dealing with known thieves is unpersuasive. According to Murphy's testimony, defendant simply stated that he could get the property back, but that it would probably take 24 hours. That statement does not support a reasonable inference that defendant associated with known thieves. Evidence cannot rationally be labeled *prejudicial* when the allegedly prejudicial inferences are remote and speculative. We conclude that, with respect to Murphy's testimony describing defendant's offer to recover the stolen property, no plausible issue of prejudice existed.[2] Since we hold that the probative value of the statement was great and its prejudicial effect negligible, exclusion of the statement would have been an abuse of discretion. (*Thor* v. *Boska* (1974) 38 Cal.App.3d 558, 566-567 [113 Cal.Rptr. 296].) The court's error in failing to do its "weighing" on the record is, therefore, harmless.

---

[2]*People* v. *Allen* (1976) 65 Cal.App.3d 426, 434-435 [135 Cal.Rptr. 276], cited by defendant is not applicable. There defendant told police that he had some very good "connections" which were superior to even those of the police; defendant told police that he would put the word out about the stolen property so that he would be informed if anyone came across it. The defendant then placed a phone call and told the listener about the theft, described the jewelry, and said that he wanted to be informed if the jewelry was sold. On appeal, the court held this statement irrelevant. The statement was exculpatory in character and had no tendency in reason to prove that defendant had taken the property. Further, the evidence was highly prejudicial; it tended to prove that defendant associated with known thieves or receivers of stolen property. Such an inference violated Evidence Code sections 1101 and 1102 by suggesting that the jury deduce guilt from the fact of defendant's character.

In the present case, in contrast, defendant's statement as described by Murphy was

## B. *Defendant's Responses to the Questions of Detective Lohse.*

■ Defendant does not deny that he initially waived his *Miranda* rights. He argues, however, that when Lohse changed the conversation from a general discussion to specific questions concerning the burglary, defendant switched from verbal to nonverbal communication. This switch, he asserts, manifested his desire to exercise his privilege against self-incrimination. ■ It is true that a suspect's initial waiver of the privilege against self-incrimination does not foreclose the assertion of that privilege at a later time. As the Supreme Court stated in *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." (*Id.* at pp. 473-474 [16 L.Ed.2d at p. 723].) An individual may invoke the privilege by any words or conduct which "'reasonably appears inconsistent with a present willingness on the part of the suspect to discuss his case freely and completely with police *at that time.* [fn. omitted].'" (Italics added. *People* v. *Burton* (1971) 6 Cal.3d 375, 382 [99 Cal.Rptr. 1, 491 P.2d 793], quoting *People* v. *Randall* (1970) 1 Cal.3d 948, 956 [83 Cal.Rptr. 658, 464 P.2d 114].)

■ The scope of review of a trial court's finding of voluntariness depends upon whether the evidence is in conflict. Where there is no conflict in the evidence, the reviewing court must make an independent examination of the record to ascertain whether defendant's statements were voluntarily made. (*People* v. *Jiminez* (1978) 21 Cal.3d 595, 609 [147 Cal.Rptr. 172, 580 P.2d 672]; *People* v. *Duren* (1973) 9 Cal.3d 218, 238 [107 Cal.Rptr. 157, 507 P.2d 1365].) Where, however, the evidence is in conflict, the reviewing court must accept the findings of the trial court if they are supported by substantial evidence within the record. (*Id: People* v. *Duck Wong* (1976) 18 Cal.3d 178, 187 [133 Cal. Rptr. 511, 555 P.2d 297]; *People* v. *Williams* (1979) 96 Cal.App.3d 736, 738 [158 Cal.Rptr. 218].)

■ All of the evidence favoring defendant's position was met with conflicting evidence. Defendant testified that when Lohse first asked a question directly dealing with the burglary, defendant began to shake

---

not exculpatory in character; on the contrary, the statement supports a valid inference that defendant had access to and control of the stolen property, which, in turn, tends to show that he took it. Further, the statement did not express defendant's association with criminals.

his head "No," as if to say, "There's no way I am going to implicate myself in any crime." He testified on cross-examination that he continued to shake his head "No" in response to all other questions except for the question, "Do you understand you are saying 'No'?" Defendant testified that at that point he did not remember having stopped shaking his head "No." Defendant then moved his chair back and dropped his head down in disgust so that he may have appeared to have nodded "Yes."

Detective Lohse, in contrast, testified that defendant responded to some of his questions by nodding his head from left to right, and others by nodding his head up and down. When asked whether he was alone during the burglary, defendant responded by nodding his head up and down.

Detective Lohse's testimony supported the court's finding that defendant responded to each question by answering "yes" and "no," communicated by his conduct in nodding his head. The testimony also supported the finding that such communicative conduct was consistent with a continued willingness to freely discuss his case. This conclusion is buttressed by the fact that defendant had waived his *Miranda* rights several minutes before responding to Lohse's questions.

Defendant also appears to suggest that his nonverbal responses should not be admissible because such responses were communicated while defendant remained "silent," thereby manifesting his assertion of the right to remain silent. He argues that the *Miranda* warnings given to him only advised that "anything you say *can* and will be used against you in a court of law" (italics added); therefore, he was not advised that anything he *did* could be similarly used. We find this argument unpersuasive. We observe that defendant raises this argument for the first time on appeal. Had he misconstrued the warnings and, in reliance upon such misconstruction, made nonverbal disclosures to Lohse, it is reasonable to infer that he would have raised such facts below. Instead, defendant testified that he understood the warnings and that both his speech and *his conduct* were uniformly unresponsive to Lohse's questions. The failure to raise such facts at the hearing below suggests that they do not exist. Further, we believe that the warning, as given, did apprise defendant that anything he intentionally communicated could be used against him. We conclude that the trial court did not err in finding that defendant had not asserted his privilege against self-incrimination when he gave nonverbal responses to Lohse's questions.

## C. *Sentencing Defendant to the Upper Base Term of Imprisonment.*

The trial court denied defendant probation and imposed the upper base term of imprisonment. The court relied upon several factors in making each decision. One of the factors common to both decisions was the vulnerability of the victim. (Cal. Rules of Court, rules 414 (c)(2), 421 (a)(3).) ■ Defendant asserts that the record lacks substantial evidence to support the trial court's findings with respect to Wolfe's vulnerability.

The court found that the following criteria enumerated under rule 414, California Rules of Court, warranted a denial of probation: (1) The likelihood that if he is not imprisoned, defendant will continue to steal and thus be a danger to society; (2) the nature, seriousness and circumstances of the crime; (3) the vulnerability of the victim; (4) the fact that defendant was an active participant in the crime; (5) the manner in which the crime was carried out demonstrated a criminal sophistication and professionalism on the part of defendant; (6) defendant's prior record of criminal conduct including the recency and frequency of prior crimes, the early age at which he was adjudicated to have committed crimes as a juvenile, and convicted as an adult and the pattern of reoccurring, increasingly serious criminal conduct; (7) his unsatisfactory present and past performance on probation and parole; (8) his inability or unwillingness to abide by the terms of his past probation and parole terms; (9) his poor past employment history, and (10) his lack of remorsefulness. The court found no facts favoring a grant of probation.

As for the court's decision to impose the upper term of imprisonment, the court found circumstances of aggravation under rule 421;[3] these circumstances were substantially similar to the facts the court relied upon in deciding to deny probation. The court found that there were no circumstances in mitigation.

---

[3]Those circumstances of aggravation were as follows: (1) the victim, himself, and his residence were particularly vulnerable; (2) the planning, sophistication and professionalism with which the crime was carried out indicated premeditation by defendant; (3) the crime involved the taking of items of great monetary value; (4) defendant's prior commission of crimes as a juvenile which were numerous and increasingly serious; (5) the fact that defendant was on parole when he committed the burglary; and (6) the fact that defendant's prior performance on parole or probation had been unsatisfactory.

Defendant contends that the above mentioned findings that the victim was "vulnerable" pursuant to rule 414 (c)(2) (criteria affecting probation) and "particularly vulnerable" pursuant to rule 421 (a)(3) (circumstances in aggravation) were not supported by evidence in the record. No other findings are challenged. Defendant makes several plausible arguments in support of his contention. We need not discuss them because, given the record before us, the error was harmless beyond a reasonable doubt. The court based its decisions with respect to probation and base term upon a multitude of aggravating facts coupled with the complete absence of any countervailing or mitigating facts. (See *People* v. *Blessing* (1979) 94 Cal.App.3d 835, 838-839 [155 Cal. Rptr. 780]; *People* v. *Dozier* (1979) 90 Cal.App.3d 174, 179 [153 Cal. Rptr. 53].) We believe that it is inconceivable that a result more favorable to defendant would have occurred in the absence of the court's challenged findings of vulnerability.

D. *Defendant's Right to Credit for Presentence Time Served.*

The trial court credited defendant's prison term with only the 140 days actually served in county jail prior to sentencing. The court gave no credit for work performance and for good behavior time that he accumulated during that confinement. Subsequent to sentencing, the Supreme Court held in *People* v. *Sage* (1980) 26 Cal.3d 498 [162 Cal. Rptr. 450, 606 P.2d 757] that a person convicted of a felony must be accorded, pursuant to principles of equal protection, work performance and good behavior credits for presentence time spent in county jail. The court declared that its decision was to apply retroactively. Defendant must therefore receive the conduct credit to which he is entitled.

III

THE PEOPLE'S CONTENTION ON APPEAL:
THE ORDER STRIKING THE PRIOR
FELONY CONVICTION

Penal Code section 667.5 provides that convicted felons who are sentenced to prison shall receive a specified "enhancement" of their prison term "for each prior separate prison term" served for a felony. The prosecution contends that a commitment to the California Reha-

bilitation Center (CRC) following a felony conviction constitutes service of a "prior separate term in state prison," within the meaning of section 667.5, subdivisions (b) and (e). It is therefore urged that the trial court erred when it entered an order striking the prior felony conviction and refused to use such conviction for purposes of enhancement. We concur, however, with a recent appellate decision directly on point (*People* v. *Lara* (1979) 95 Cal.App.3d 247 [158 Cal.Rptr. 847]), and affirm the trial court's order.

Penal Code section 667.5, subdivision (e), makes clear that a prior "term in state prison" is a necessary precondition to enhancement under section 667.5: "The additional penalties provided for prior prison terms shall not be imposed for any felony for which the defendant did not *serve* a prior separate *term in state prison.*" (Italics added.) The Legislature defined the phrase "term in state prison" in section 667.5, subdivision (h), as follows: "Serving a prison term includes any confinement time in any state prison or federal penal institution *as punishment for commission of an offense* including confinement in a hospital or other institution or facility credited as service of prison time in the jurisdiction of such confinement." (Italics added.) The use of the term "punishment" in defining a prison term is not incidental. As stated in Penal Code section 1170, "The Legislature finds and declares that the purposes of imprisonment for crime is punishment."

In contrast, the Legislature has clearly stated that the purpose of the addict commitment program is to treat, rehabilitate and, where necessary, to control, but *not* to punish.[4] (Welf. & Inst. Code, § 3000; *People* v. *Lara, supra,* 95 Cal.App.3d 247, 250; see also *People* v. *Myers* (1972) 6 Cal.3d 811, 817 [100 Cal.Rptr. 612, 494 P.2d 684].) The dissimilarity of purpose between imprisonment and CRC commitment is emphasized in *People* v. *Reynoso* (1966) 64 Cal.2d 432, 435 [50 Cal.

[4]Section 3000 of the Welfare and Institutions Code states in pertinent part as follows: "It is the intent of the Legislature that persons addicted to narcotics, or who by reason of repeated use of narcotics are in imminent danger of becoming addicted, shall be treated for such condition and its underlying causes, and that such treatment shall be carried out for nonpunitive purposes not only for the protection of the addict, or person in imminent danger of addiction, against himself, but also for the prevention of contamination of others and the protection of the public. Persons committed to the program provided for in this chapter who are uncooperative with efforts to treat them or are otherwise unresponsive to treatment nevertheless should be kept in the program for purposes of control. It is the further intent of the Legislature that persons committed to this program who show signs of progress after an initial or subsequent periods of treatment and observation be given reasonable opportunities to demonstrate ability to abstain from the use of narcotics under close supervision in outpatient status...."

Rptr. 468, 412 P.2d 812]: "Commitment under article 2 of the act governing commitment and corrective treatment of narcotic addicts does not imprison the subject, is not a punishment for crime, is not penal confinement, and the act is not a penal statute. Such commitment constitutes compulsory treatment of the addict as a sick person. [Citations.] [¶] In enacting the subject statute, the Legislature intended to create a new program for the confinement (which in truth is a quarantine rather than penal sanction), treatment and rehabilitation of narcotics addicts. [Citation.]"

The prosecution attempts to emphasize similarities between CRC commitment and imprisonment. He therefore points to Supreme Court cases which hold that persons subjected to CRC commitment proceedings are entitled to procedural protections afforded to persons subjected to criminal proceedings. (*People* v. *Thomas* (1977) 19 Cal.3d 630, 644 [139 Cal.Rptr. 594, 566 P.2d 228] [holding proof beyond a reasonable doubt and unanimous jury verdict required for CRC commitment]; *In re Bye* (1974) 12 Cal.3d 96, 102, 108-110 [115 Cal.Rptr. 382, 524 P.2d 854] [holding outpatient status at CRC cannot be revoked without due process hearing]; *People* v. *Moore* (1968) 69 Cal.2d 674, 682 [72 Cal. Rptr. 800, 446 P.2d 800] [holding exclusionary rule applicable to CRC commitment proceedings].) Such cases do show our Supreme Court's recognition that involuntary commitment is incarceration against one's will regardless of whether it is called "civil" or "criminal."

That a threatened incarceration entitles one to due process protection does not mean that such incarceration is imposed for the purpose of "*punishment.*" An incarceration which is imposed solely for rehabilitative and protective purposes simply does not qualify as a "prison term" for purpose of sentence enhancement. (Pen. Code, § 667.5, subds. (e), (h).)

The prosecution also raises an equal protection claim: "Pursuant to Penal Code section 667.5 (h) all defendants having an out of state case resulting in confinement in a place like CRC will be subject to the one year enhancement. If California defendants committed to CRC are not subject to the same punishment for their prior, a substantial equal protection problem would be present. [Citation.] What possible legitimate reason could the Legislature have for adding a year to the sentence of out of state addicts committed to a hospital, but those who

are committed to CRC and commit new crimes would receive no additional punishment?"

The prosecution thus assumes without analysis that it has standing to assert the rights of unascertained addicts who have been committed to out-of-state hospitals and who subsequently commit a felony in California for which they are sentenced to prison. Even if we accepted the unlikely proposition that the prosecution has standing to assert such claims, we nevertheless reject the prosecution's argument as lacking substance.

Contrary to the People's assertion, section 667.5 of the Penal Code, as interpreted herein, does not treat out of state addicts who are committed to a "place like CRC" different than addicts committed to CRC. "The equal protection clause does not assure defendant of the same treatment as all other felons; it assures him only, in this respect, that he will receive like treatment with all other persons similarly situated." (*People* v. *Enriquez* (1977) 19 Cal.3d 221, 229 [137 Cal.Rptr. 171, 561 P.2d 261]; *Truax* v. *Corrigan* (1921) 257 U.S. 312, 333 [66 L.Ed. 254, 263, 42 S.Ct. 124, 27 A.L.R. 375].) Felons previously committed to an out-of-state facility for nonpunitive purposes are similarly situated with felons previously committed to CRC; hence, such persons are not subject to longer prison terms on the basis of such commitment. On the other hand, felons previously committed to a hospital or other institution for the purpose of punishment for an offense may fall within the provisions of section 667.5; it is immaterial that the commitment occurred in California rather than elsewhere. In such case, defendants are not subjected to differential treatment because they were committed in California rather than elsewhere.[5] Rather, the basis for classification is the purpose of commitment, punitive or nonpunitive. The People have not challenged the rationality of that classification. The equal protection argument therefore fails. (*People* v. *Enriquez, supra*, 19 Cal.3d 221, 229.)

---

[5]*In re King* (1970) 3 Cal.3d 226 [90 Cal.Rptr. 15, 474 P.2d 983], cited by the prosecutor, is clearly distinguishable. That case dealt with a penal statute that provided that nonsupporting fathers who remained out of state for 30 days were guilty of a felony, whereas those who remained in California were guilty only of a misdemeanor. (*Id.* at p. 231; former Pen. Code, § 270, amended by Stats. 1971, ch. 1587, § 1.) Thus, the statute singled out persons who remained out of state for 30 days for more severe punishment. The statute before us, in contrast, makes no such distinction. Persons committed outside California receive the same treatment as those committed within California. The classification is based upon the purpose—not the state—of commitment.

Computation of credit for time served shall be by the Department of Corrections. If there be any dispute as to the correctness of such credit, recourse should first be with the trial court.

The judgment and order are affirmed.

Kaus, P. J., and Hastings, J., concurred.

A petition for a rehearing was denied June 26, 1980, and the petition of defendant and appellant for a hearing by the Supreme Court was denied July 30, 1980.