[S.F. No. 22812. In Bank. July 7, 1971.]

JOHN LINLEY FRAZIER, Petitioner, v.
THE SUPERIOR COURT OF SANTA CRUZ COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Britton & Jackson and James A. Jackson for Petitioner.

No appearance for Respondent.

Evelle J. Younger, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, Robert R. Granucci, John T. Murphy and Karl J. Uebel, Deputy Attorneys General, for Real Party in Interest.

**OPINION**

**MOSK, J.**—Defendant John Linley Frazier, under indictment in Santa Cruz County on five counts of murder (Pen. Code, § 187), moved for a change of venue on the ground that a fair and impartial trial cannot be had in that county. (Pen. Code, § 1033.) ■ The motion was denied, and he seeks a writ of mandate to compel respondent court to grant the relief sought.[1] The remedy is appropriate. (*Maine* v. *Superior Court* (1968) 68 Cal.2d 375, 378-381 [66 Cal.Rptr. 724, 438 P.2d 372].)

On October 19, 1970, Dr. Victor Ohta, a prominent Santa Cruz eye surgeon, his wife, their two sons aged 11 and 12 years, and Dr. Ohta's secretary were found murdered at the Ohtas' hilltop mansion outside Soquel. Dr. Ohta had been shot once in the chest and twice in the back, while each of the other four victims had been killed by a single bullet in the back of the head. All five had been bound with scarves and thrown into the family swimming pool. Several fires had been set in the Ohtas' house, apparently in an effort to burn it down.

The residents of the Santa Cruz area understandably experienced a two-fold reaction of grief and fear after this mass killing. Dr. Ohta had lived and practiced in Santa Cruz for a decade, and was a founder of one of the local hospitals. Testimonials to the deep sense of loss caused by his murder and that of his wife and sons filled the newspapers, and several reward funds were set up for the apprehension and conviction of those responsible. Well over a thousand people attended the Ohta funeral a few days later, described as "certainly one of the largest in county history," and 300 more attended the funeral of Dr. Ohta's secretary. At the same time, fears were expressed in the press that the killers might strike again, and both gun sales and requests for guard dogs increased substantially. Reflecting these moods

[1]After making its ruling the court stated it would "request and direct" counsel for defendant to file the present petition.

of the citizenry, the county board of supervisors conditionally created its own reward fund and declared that "the entire community of Santa Cruz County is shocked by the appalling execution-type killings recently occurring in this area."

Public suspicion quickly began to focus on the "hippie" element in the community. According to the newspapers there was a widespread distrust and dislike of hippies among older residents, who objected to their appearance and life style and to the "communes" that had been set up in the rural areas. Indeed, at the meeting of the county board of supervisors mentioned above a number of citizens called for laws specifically aimed at hippies, and the board chairman stated, "I know some people will scream about their rights getting stepped on but we are going to have to start looking at the transient element, and those people who come here with no visible way of making a living." He also characterized the murders as of "the same magnitude as the Sharon Tate slayings," referring to the multiple crimes for which Charles Manson and his hippie "family" were then on trial in Los Angeles. Another supervisor echoed the chairman's views, and urged the board to seek "laws against itinerants."

The community's belief that hippies were responsible in this case was reinforced by the bizarre nature of these "execution-type killings" and the apparent lack of any rational motive.[2] Thus a local newspaper editorialized on October 21 that "The most terrifying thing about this crime and others of recent record is its cold impersonality. It is at least partly understandable, though not justifiable, when a human life is taken in the course of a personal quarrel or an armed robbery. It is simply frightening to realize that human lives are taken, right here in our own small county, apparently for no reason by utter strangers whose motives were neither personal anger nor monetary gain.

"We come to the thought that to the mental imbalance already afflicting a certain part of the population are added two dangerous new factors— the cult of drug abuse and a disregard for others' rights including the right to live.

"No evidence yet points to the criminals' identity, let alone their attitudes or use of drugs. But it certainly is clear that this was the work of people gone utterly mad, and that none of us is safe from them or others like them."

Later that same day, however, evidence of the kind mentioned in the editorial was made public. When they arrived on the murder scene on

---

[2]No money was taken from the house, nor was Mrs. Ohta's jewelry removed from her body, and the female victims were not sexually molested.

October 19 law enforcement authorities had discovered a strange note left on the windshield of Dr. Ohta's car. It declared that "World War 3" has begun, and warned that "From this day forward" anyone who "misuses the natural environment" will "suffer the penalty of death by the people of the free universe," and that "materialism must die or mankind will." The note was signed, "Knight of Wands, Knight of Cups, Night [sic] of Pentacle and Knight of Swords." The latter are characters from the tarot deck, an ancient form of playing cards used in fortune-telling. Interest in tarot cards has been revived in recent years by hippies and others similarly inclined to occultism and psychic experiences.

The sheriff withheld the contents of the note for two days while his investigation proceeded, but on October 21 he finally released it in the hope its dissemination would bring public assistance in solving the case.[3] The release of the note had the desired effect, but it also further divided the community. As one newspaper graphically put it, "Naked fear stalks the normally placid countryside of Santa Cruz County. The Soquel massacre, steeped in mysticism and stamped with a clear warning that other similar deaths might follow, has chilled the marrow of the established community. Hippie-types, for their part, fear indiscriminate vigilante retaliation against innocent members of their culture." Demands for such retaliation led the Mayor of Santa Cruz to issue an appeal asking the public to remain calm.

Meanwhile, acquaintances of defendant Frazier read the murder note and went to the police. Information provided by them and by defendant's estranged wife furnished grounds for obtaining an arrest warrant on October 22. As reported in the newspapers, the affidavit for the warrant recited inter alia that defendant had been living in a shack not far from the Ohtas' home for several months; that he stayed at his wife's house on the night of October 17, and when he went out the next morning he carried a loaded pistol, binoculars, and a backpack but left his wallet and driver's license, saying "I won't be needing these any more"; that he also left behind a book on tarot cards; and that when an acquaintance and defendant were walking in the Soquel hills six weeks earlier they came to the Ohtas' home, and defendant said he had been inside it and people who lived as the Ohtas did

---

[3]We do not mean to criticize the sheriff's action in releasing the note. While damaging or controversial items of evidence in the custody of law enforcement authorities ordinarily should not be disclosed to the public prior to trial, an exception may be justified when the authorities reasonably believe (1) the public can furnish valuable assistance in identifying a dangerous criminal who is still unknown or apprehending one who is known but at large, and (2) the release of a particular piece of evidence is likely to produce that result. Those standards appear to have been met with respect to the murder note in the present case. (See also American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press (1966) [commonly called the Reardon Report], at pp. 5, 6.)

were "materialistic" and "should be snuffed." Another edition of the paper reported that "witnesses have stated that Frazier used to spy on the Ohta home from a clump of redwoods on the hillside above their home and that he had told them he was going to do away with the family."

At dawn on October 23 defendant was arrested in his shack. Newspaper photographs of the event showed him to have long hair and a beard. Although he had lived in Santa Cruz for a number of years, in the months preceding the murders he had radically changed. His acquaintances reported that he "dropped out and entered the hippie style of life," and "was a loner who did not widely advertise his feelings. He was not known to many people. . . ."

On October 28 the Santa Cruz grand jury indicted defendant on five counts of murder. In a commendable effort to minimize the possibility of prejudice the trial court simultaneously issued an "Order re Publicity," prohibiting any attorney, court attache, law enforcement official, or witness from thereafter releasing any extrajudicial statement by defendant or any evidence in the case and from publicly commenting on any such evidence or on prior or prospective testimony.[4]

Finally, the fiscal impact of the Frazier case—its actual and potential drain on the Santa Cruz County coffers—has since been brought to the public's attention. Thus in reporting on a substantial budget overrun in the sheriff's office and the negative reaction of the county board of supervisors, the newspapers stated that a major portion of the deficit was caused by the expenses of investigating the Ohta murders and the extraordinary security precautions that have surrounded Frazier's custody from the day of his arrest. And in editorializing on the high cost to the public of such trials as those of Sirhan Sirhan, Charles Manson, and Angela Davis, the principal local newspaper told its readers that "Santa Cruz County may find itself in a similar bind with the upcoming John Linley Frazier trial. Frazier, accused of murdering five people, has pleaded innocent. Local governmental experts believe the trial, which is expected to be sensational in nature, will cost this tiny county $25,000 and if Frazier's attorney demands a change of venue the figure could be doubled.

"Should the trial cost $50,000 it will be two cents on the tax dollar that will be eaten up."

On this record the case at bar is governed by our decisions in *Maine* v.

---

[4]The order specifically excluded such items as factual statements identifying the accused and the charges against him, quotations from public court records in the case, and requests for public assistance in obtaining additional evidence or names of witnesses (see fn. 3, *ante*).

*Superior Court* (1968) *supra,* 68 Cal.2d 375, *Fain* v. *Superior Court* (1970) 2 Cal.3d 46 [84 Cal.Rptr. 135, 465 P.2d 23], and *People* v. *Tidwell* (1970) 3 Cal.3d 62 [89 Cal.Rptr. 44, 473 P.2d 748]. We do not doubt the sincerity of the witnesses who testified at the hearing on the motion for change of venue that in their opinion defendant could receive an unbiased trial in Santa Cruz County, or of the learned trial judge who so concluded in denying relief. ■ But in *Tidwell* (3 Cal.3d at p. 71) we noted the factors which may unwittingly affect the objectivity of the latter judgment, and in *Maine* (68 Cal.2d at pp. 382-383) we established that in cases such as this it is the duty of the reviewing court to make an independent evaluation of the record and to satisfy itself de novo that the defendant can obtain a fair and impartial trial in the county of original venue.

We have undertaken that evaluation. ■ Here, as in *Maine, Fain,* and *Tidwell,* the defendant faces capital charges arising out of his alleged commission of brutal and senseless murders. In each case the victims were prominent local citizens, whose fate drew expressions of public sympathy and generosity. Although defendant was also a resident of the area, he had chosen to "drop out" of the ongoing life of the community and retained few if any close friends. While no formal confession of defendant was released by law enforcement authorities, the public learned through the newspapers that defendant had made highly incriminating threats to "snuff" or "do away with" the Ohta family. Further delay in bringing defendant to trial will not cure the matter, as the size and nature of the population of Santa Cruz County are such that these shocking crimes remain firmly "embedded in the public consciousness" (*Maine* v. *Superior Court, supra,* at p. 387 of 68 Cal.2d).[5] And "although trial participants here were not competing election candidates as in *Maine,* news items indicate that there was considerable political debate concerning the fiscal impact of the trial." (*People* v. *Tidwell, supra,* at p. 71 of 3 Cal.3d.)

Under the rule of the cited cases, defendant has thus made a satisfactory showing that he is entitled to the relief prayed for. Yet there is another element here in his favor, perhaps more elusive but potentially no less significant. The record discloses that even before defendant was charged with these murders many residents of Santa Cruz County felt a deep-seated antagonism towards hippies, which they expressed both in person and

---

[5] With a 1970 population of 123,790, Santa Cruz County ranks 23d of California's 58 counties, and has fewer residents than the county (Stanislaus) where the crimes in *Fain* took place. It is also the state's smallest county in area, other than the city-sized "county" of San Francisco. Even the principal local newspaper, quoted hereinabove, characterizes Santa Cruz as "this tiny county."

through their local government representatives.[6] It is not our province to judge the reasons for this attitude, but simply to take note of its existence and determine its effect. At oral argument, moreover, the Attorney General frankly conceded that it still prevails. He sought to minimize its relevance by pointing out that the hippie population of Santa Cruz was also shocked by these crimes and assisted the police in identifying and locating the prime suspect. But while this fact tends to reinforce the essential friendlessness of defendant, it is unlikely to have had much permanent effect in lessening the community's resentment against hippies as a category.

As we have seen, from his appearance and life style defendant Frazier has become identified in the mind of the Santa Cruz public as a hippie. We recognize that in some criminal trials there is at least the possibility, regrettably, that the defendant may be judged on his appearance and life style rather than on his proven acts. In the circumstances here shown, however, that consequence is more probable than possible. It would fly in the face of human nature to presume that jurors drawn from the Santa Cruz area, despite eventual claims of impartiality on *voir dire* (see *People v. Tidwell, supra,* at p. 73 of 3 Cal.3d), would not be affected in their deliberations, consciously or otherwise, by this pervasive community attitude with respect to hippies. There may not be, as the trial court found, hostility toward this particular defendant as an individual; but so long as there is hostility towards the group or subculture with which he is identified, he runs the very real risk of being judged not for what he has done but for what he is, or what he appears to be.

■ We fashioned in *Maine* the remedy of a pretrial change of venue precisely to obviate such a risk. Under the *Maine* rule, a change of venue must be granted when the defendant shows, as here, "a reasonable likelihood that in the absence of such relief, a fair trial cannot be had." (68 Cal.2d at p. 383.) Contrary to the view expressed by the Attorney General at oral arument, "reasonable likelihood" of prejudice does not mean that prejudice must be "more probable than not": as we explained in *Tidwell* (at p. 69 of 3 Cal.3d), a defendant is entitled to such relief "not only when a preponderance of circumstances calls for such a result, but also whenever

---

[6]On the latter point we have quoted public statements of members of the Santa Cruz County Board of Supervisors favoring the enactment of ordinances designed to discourage the influx or continued presence of hippies and similar "itinerants." That our concern is not far-fetched is indicated by the fact that barely two years earlier another seaside city not far distant—Carmel—adopted an ordinance limiting the use of public property, accompanied by a declaration of urgency reciting that the legislative body "has observed an extraordinary influx of undesirable and unsanitary visitors to the City, sometimes known as 'hippies,' " and warning against "the unregulated and uncontrolled conduct of the new transients." (*Parr* v. *Municipal Court* (1971) 3 Cal.3d 861, 863 [92 Cal.Rptr. 153, 479 P.2d 353].)

a defendant has shown *even* a 'reasonable likelihood' that he will not receive a fair trial." (Italics added.)

In finding such a reasonable likelihood in the case at bar we do not imply criticism of the commendable way in which this difficult matter was handled by the local law enforcement authorities and the trial court, and covered in the local press. Even prior to the court's order re publicity, admirable restraint had been exhibited in the release and dissemination of information bearing on these crimes and the defendant's involvement therein. And that order, we agree, has since been scrupulously observed.[7]

No amount of self-restraint or judicial caution, however, could change the facts and circumstances of the case. This was not an "ordinary" homicide, such as all too often occurs in the course of a robbery of a liquor store or a service station, or during a family dispute; we entertain no doubt that the defendants in those cases can receive unbiased trials in Santa Cruz County. Rather, we deal here with an alienated member of an unpopular subculture accused of a bizarre and senseless mass murder of prominent citizens of a small community. For the reasons explained in our prior decisions on the subject, only a change of venue can ensure that such a defendant obtains the fair and impartial trial to which he is constitutionally entitled.

Let a peremptory writ of mandate issue directing the Superior Court of Santa Cruz County to grant the motion for change of venue, hold a hearing to determine a place where a fair and impartial trial can be had, and transfer the cause to that place.

Wright, C. J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

**McCOMB, J.**—I dissent. I would deny the writ.

---

[7]In denying the motion for change of venue, the trial judge suggested that if "we have to move the trial from a county of this size even where there is a restraint on publicity, then . . . there is [no] point in restraining the publicity. . . ." While we are sympathetic with the concern of the judge who had made a valiant effort to deter prejudicial publicity and thus to circumscribe community emotions, we do not agree that orders for change of venue in appropriate cases will eliminate the motivation for courts and law enforcement officials to protect defendants from prejudicial publicity. If a serious crime is committed, public officials can be expected to perform their duty to assure that the responsible person or persons be tried and convicted upon constitutional principles, wherever the site of the trial.