[Crim. No. 18498. First Dist., Div. Three. June 26, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
BRIAN FRANCIS McGREEN et al., Defendants and Appellants.

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, B. E. Bergesen III and Allan H. Keown, Deputy State Pub-

lic Defenders, Robert E. Freitas and Orrick, Herrington, Rowley & Sutcliffe for Defendants and Appellants.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Alan S. Meth, A. Wells Petersen and Jay M. Bloom, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

FEINBERG, J.—Appellants McGreen and Race were charged in three counts as follows: Count I—robbery of one Kurt Flickner (Pen. Code, § 211),[1] count II—attempted robbery of a gasoline station (§ 664), and count III—burglary of a gasoline station (§ 459).[2] Each count contained an allegation that in the commission of the alleged offenses, appellant McGreen did personally use a firearm in violation of section 12022.5. Each count contained a further allegation that in the commission of each alleged offense, appellant Race was armed with a firearm in violation of section 12022, subdivision (a).

McGreen was convicted of all three counts as charged. Race was acquitted of count I and convicted of the other two counts.

The trial court reduced the burglary conviction as to each appellant to burglary in the second degree and stayed imposition of sentence thereon.

We shall set forth the evidence as it becomes relevant to the issues raised. We discuss each appellant's contentions separately.

### Appellant McGreen

There is no question but that McGreen committed the acts alleged in the three counts of the information. His defense was solely diminished capacity. There are four areas of claimed reversible error which we now proceed to discuss.

---

[1]All section references are to the Penal Code unless otherwise noted.

[2]The burglary involved the same acts that gave rise to the attempted robbery charge.

A. ▮ *The trial court had a sua sponte duty to instruct on assault with a deadly weapon (§ 245, subd. (a)) as a lesser included offense of the charges of robbery and attempted robbery, each with an allegation of a use clause, which duty the trial judge failed to discharge.*

### 1.   *The Robbery—Count I*

Both sides agree that the question of a lesser included offense may arise in one of two ways: either, as a matter of law, the lesser offense is included in the greater offense charged or when the charge *as actually pleaded* necessarily includes the lesser offense. (*People* v. *Marshall* (1957) 48 Cal.2d 394 [309 P.2d 456].)

Appellant concedes that assault with a deadly weapon is *not*, as a matter of law, a lesser included offense of robbery but he does contend that when, as here, a robbery is charged with the further allegation that in the commission of the offense the robber used a firearm, assault with a deadly weapon *is* a necessarily included offense.

Respondent argues that assault with a deadly weapon is not necessarily included in robbery because (1) simple assault (§ 242), as a matter of law, is not necessarily included and, therefore, assault with a deadly weapon, a fortiori, is not included, and (2) in any event, the allegation of the use clause is an enhancement and enhancements cannot be considered in determining whether the pleading encompasses a lesser included offense. We disagree.

(a) Robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) It "is a combination of theft and assault" (*People* v. *Salas* (1978) 77 Cal.App.3d 600, 607 [143 Cal.Rptr. 755]; "[robbery] is a crime which is both larcenous and assaultive" (*People* v. *Rist* (1976) 16 Cal.3d 211, 220 [127 Cal.Rptr. 457, 545 P.2d 833]; see also *People* v. *Fries* (1979) 24 Cal.3d 222, 227 [155 Cal.Rptr. 194, 594 P.2d 19].)

▮ Thus, in *Salas, supra*, the court stated: "robbery includes the lesser offense of simple assault." (77 Cal.App.3d at p. 607; accord *People* v. *Sutton* (1973) 35 Cal.App.3d 264, 270 [110 Cal.Rptr. 635]; *People* v. *Guerin* (1972) 22 Cal.App.3d 775, 781-782 [99 Cal.Rptr.

573], cert. den., 409 U.S. 859 [34 L.Ed.2d 105, 93 S.Ct. 145].) Accordingly, we hold that simple assault, as a matter of law, is necessarily included in robbery.

■■■ (b) We agree that since the amendment to section 211a, effective July 1, 1977, eliminating degrees of robbery, assault with a deadly weapon is not, as a matter of law, a lesser included offense of robbery.[3] Thus, the question becomes what is the effect of the prosecution pleading an enhancement allegation such as here: "that at the time of and in the commission of the [robbery]...McGreen personally used a firearm ...within the meaning of section 12022.5?"

A line of cases, the seminal case being *People* v. *Orr* (1974) 43 Cal. App.3d 666 [117 Cal.Rptr. 738], holds "that an allegation of firearm use for purposes of Penal Code section 12022.5 is not to be considered in determining whether the accusation encompasses a lesser included offense." (*Id.*, at pp. 673-674; accord *People* v. *Benjamin* (1975) 52 Cal. App.3d 63, 71-72 [124 Cal.Rptr. 799]; *People* v. *Wilson* (1976) 62 Cal.App.3d 370, 374 [132 Cal.Rptr. 813]; *People* v. *Salas, supra,* 77 Cal.App.3d 600, 607; *People* v. *Cole* (1979) 94 Cal.App.3d 854, 861-862 [155 Cal.Rptr. 892].)

*Benjamin* relied on *Orr; Wilson* relied on *Benjamin* and *Orr; Salas* relied on *Orr; Cole* relied on *Wilson, Benjamin* and *Orr.*

Simply put, the rationale of these decisions is that section 12022.5 provides for an enhancement, i.e., increased punishment, for felonies; the section does *not* create any substantive offense. Therefore, it cannot give rise to any necessarily included offense.

Justice Holmes wrote, "It is one of the misfortunes of the law that ideas become encysted in phrases and thereafter for a long time cease to provoke further analysis." (*Hyde* v. *United States* (1912) 225 U.S. 347, 391 [56 L.Ed. 1114, 1135, 32 S.Ct. 793] (dis. opn. of Holmes, J.).)

---

[3]Prior to the amendment, it had been held that assault with a deadly weapon was a lesser included offense of first degree robbery. (See *People* v. *Sutton, supra,* 35 Cal. App.3d 264, 271; *People* v. *Guerin, supra,* 22 Cal.App.3d 775, 782-783.) In *People* v. *Amin* (1978) 88 Cal.App.3d 637 [152 Cal.Rptr. 9], the *Guerin* court repudiated its holding in *Guerin* that assault with a deadly weapon was a necessarily included offense within the crime of robbery in the first degree though it conceded that *Amin* did not present that precise issue.

We have undertaken that "further analysis" and respectfully disagree with *Orr* and the cases that follow it.

*Orr* states that its holding is a "logical consequence" (43 Cal.App.3d at p. 673) of the rule in *People* v. *Henry* (1970) 14 Cal.App.3d 89 [91 Cal.Rptr. 841].

In *Henry* the defendant was charged with and convicted of first degree robbery and with using a gun in the commission thereof in violation of section 12022.5. He asserted that he could not suffer the additional punishment under section 12022.5 because that was a lesser included offense of armed robbery and double jeopardy prevents conviction of both. The *Henry* court pointed out, inter alia, "that section 12022.5 does not describe an offense. . . . Section 12022.5 merely provides additional punishment for an offense in which a firearm is used." (*Id.*, at p. 92.) In other words, there is no criminal charge of "using a gun." We agree with *Henry* but *Henry* only held that there is no double jeopardy issue when the punishment for an underlying felony is increased because a firearm was used in the commission of that felony. There is nothing in *Henry* to suggest that a charge of robbery with a section 12022.5 use clause does not necessarily include the offense of assault with a deadly weapon. Nor does it follow logically that because section 12022.5 is an enhancement provision and not the legislative creation of a substantive offense, the allegation thereof as a part of some substantive criminal charge may not give rise to a necessarily included substantive offense. We conclude that *Orr* is not a "logical consequence" of *Henry*; it is a deductive leap therefrom.

We now essay our own analysis. Section 969d provides in relevant part: "Whenever a defendant used a firearm as recited in Section 12022.5, the fact that the defendant used a firearm may be charged in the accusatory pleading. This charge, if made, shall be added to and be a part of the count or each of the counts of the accusatory pleading which charged the offense." It is clear, as clear can be, that section 969d makes a use allegation a part of the substantive criminal charge pleaded.

In *People* v. *Marshall, supra*, 48 Cal.2d 394, it was established that an offense, not necessarily included as a matter of law, may become such because of the "specific language of the accusatory pleading." (*Id.*, at p. 405.)

Applying that principle, we reason as follows:

i.   Simple assault is a necessarily included offense of robbery as a matter of law (see cases cited above).

ii.   The allegation that McGreen used a firearm in the commission of the robbery is a part of the charge of robbery (§ 969d).

iii.   The "use" allegation is part of the "specific language of the accusatory pleading." (*Marshall, supra.*)

Therefore, the charge of robbery with a "use" allegation encompasses assault with a deadly weapon.

We can find only one California case that gently but indirectly suggests that *Orr* and its offspring may be wrong. In *People* v. *Gray* (1979) 91 Cal.App.3d 545 [154 Cal.Rptr. 555], the court said in speaking of *Orr* and the cases that followed it, "Penal Code sections 954, 969c, 969d, and 12022.7 (which govern the lodging of enhancement charges) indicate that the firearm use and bodily injury allegations become part of the allegations of the information which was not discussed in either *Wilson* or *Orr, supra.*" (At pp. 556-557, fn. 14.)

We do find support in *United States* v. *Johnson* (D.C.Cir. 1973) 475 F.2d 1297. There, the court held under the Washington, D.C. code that assault with a deadly weapon was included within the crime of robbery when the robbery was alleged to have been committed by a person armed with a firearm. The Washington, D.C. code provided an "enhancement" scheme similar to California's.[4]

In the case at bench, if the jury had a reasonable doubt that appellant, because of diminished capacity, was not capable of forming the specific intent necessary to commit the crime of robbery, then, as appellant concedes, he was guilty of assault with a deadly weapon. Thus, this is not a case where appellant was guilty of robbery or guilty of nothing.

It follows, therefore, that it was error to fail to instruct *sua sponte* on the necessarily included offense. (*People* v. *Modesto* (1963) 59 Cal.2d

---

[4]See 22 D.C. Code section 502 (1967), defining assault with a deadly weapon; 22 D.C. Code section 2901 (Supp. V., 1972), defining robbery, and 22 D.C. Code section 3202 (Supp. V., 1972), providing an additional punishment for a person committing a violent crime who is armed with a firearm.

722 [31 Cal.Rptr. 225, 382 P.2d 33]; *People* v. *Sedeno* (1974) 10 Cal.3d 703 [112 Cal.Rptr. 1, 518 P.2d 913].) But such error is not reversible error if "it is possible to determine that although an instruction on a lesser included offense was erroneously omitted, the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions." (*People* v. *Sedeno, supra*, 10 Cal.3d at p. 721.) However, we need not consider whether the error is reversible error for, as we explain below, we reverse for other reasons.

### 2. *The Attempted Robbery—Count II*

█  Appellant argues that assault with a deadly weapon is an offense necessarily included within the charge of attempted robbery with a "use" allegation. Therefore, the trial court should have so instructed the jury *sua sponte.*

We disagree. █  "The elements of attempt are specific intent to commit a particular crime and a direct act done towards its commission." (*People* v. *Miles* (1969) 272 Cal.App.2d 212, 217 [77 Cal.Rptr. 89].) "The acts of proximity need not include the last proximate act for the completion of the crime. It is sufficient that the overt acts reach far enough toward the accomplishment of the offense to amount to the '*commencement* of its consummation.' [Citations.]" (*Id.*, at p. 218.) █  Thus, though robbery combines the elements of theft and assault, it is quite possible that an *attempted* robbery never reached the stage of an assault before the attempt was frustrated or abandoned. (See *People* v. *Robinson* (1960) 180 Cal.App.2d 745 [4 Cal.Rptr. 679].) We need not consider whether there can be an attempted assault because our Supreme Court has squarely held that we have no such crime. (*In re James M.* (1973) 9 Cal.3d 517 [108 Cal.Rptr. 89, 510 P.2d 33].) Nor do we believe that the "use" allegation in connection with a charge of attempted robbery changes our analysis. One may use a gun in an attempt to commit a robbery and again the attempt may be frustrated before there has been an assault.

We conclude that assault with a deadly weapon is not a necessarily included offense to a charge of attempted robbery with an allegation of a "use" clause, either as a matter of law or as a matter of the specific allegations pleaded herein. It follows, of course, that there was no error in this regard.

## B. *Prosecutorial Misconduct*

We have noted that McGreen's sole defense to the charges was diminished capacity. In support of that defense, there was substantial evidence that he had been drinking beer and vodka during the evening preceding the robbery. Earlier that day, appellant testified he had taken three Valium tablets and he further testified that during his evening's drinking bout, he ingested four-to-six more Valium tablets. There was evidence that he had a medical prescription for Valium.

No blood samples were taken from appellant to determine the presence and quantity of alcohol or any other drug in his system.[5]

Appellant called an expert witness who was duly qualified[6] to testify as to (1) the quantity of alcohol circulating in appellant's blood stream at the time of the alleged crimes, (2) the effects of alcohol upon the brain, and (3) the effect of ingesting Valium upon a person who has alcohol in his blood stream.

The expert testified that appellant, based on his testimony as to how much he consumed, would have had an alcohol blood level of approximately .22 percent between 1:30 and 2:30 a.m.[7] The expert testified that the effect of the Valium tablets taken with alcohol would have been to heighten or intensify exponentially, as it were, the effects of the alcohol and Valium (synergistic effect). Finally, the expert testified that, in his opinion, a person with a .22 percent blood alcohol level, who had also taken four tablets of Valium, would "not be aware of what he is doing" and would have "a significantly reduced level of consciousness."

The prosecutor made no challenge to the qualifications of the expert witness by way of voir dire. Instead, by cross-examination, he sought, inter alia, to discredit the witness by attempting to show that the witness had gotten B and C grades in certain courses in graduate school,[8]

[5]McGreen was shot and seriously wounded in the course of the attempted robbery and taken to a hospital. But no blood sample was taken to determine a blood alcohol level.

[6]He testified that he had been continuously employed since 1960 as a toxicologist and criminalist and had testified in many cases.

[7]The robbery occurred at about 1:30 a.m. and the attempted robbery at about 2:30 a.m.

[8]The witness received a bachelor of science degree in the school of criminology in 1958 and his master's degree in 1960, both from the University of California at Berkeley.

and that the witness' membership in certain learned scientific societies (American Chemical Society, Sigma Xi,[9] Western Pharmacology Society) was a sham, in effect. The record contains some 11 pages interspersed with objections by defense counsel devoted to this cross-examination. Eventually, the trial court foreclosed the prosecutor from any further cross-examination on these lines. We have adverted to this line of cross-examination not to assert that it was in considerable measure irrelevant (though it was) and pettifogging (which it was) nor to suggest that it constituted reversible error (which it was not) but rather to serve as a backdrop for that which followed.

Subsequently, in the course of the cross-examination, the prosecutor questioned the witness as set forth in the margin.[10] Despite the court's ruling foreclosing further examination along this line, the prosecutor was not to be denied. His next question was "Mr. Parker, a vote was taken by your association members; is that correct?" There was an objection which was sustained. The prosecutor pressed on—"Why did you leave the California Association of Criminalists?" There was no objection and the witness answered. In effect, the witness stated that accusations had been made by a "disgruntled" district attorney or otherwise as to his ethics with regard to certain cases. Because, under

---

[9]Sigma Xi is a national scientific honorary society. (See Baird's Manual of American College Fraternities (19th ed. 1977) pp. 707-708.)

[10]The pertinent portions of the prosecutor's cross-examination are quoted as follows:
"Q. Now is there an organization called the California Association of Criminalists?
"A. Yes.
"      .      .      .      .      .      .      .      .      .      .      .      .
"Q. You used to be a member of it?
"A. Yes, I was an officer and member until 1972, I believe, when I resigned.
"Q. Okay, and you resigned because of allegations of unethical conduct relating to, among other things, your purported perjury at the John Lindley Frazier trial?
"DEFENSE COUNSEL: I object to that.
"PROSECUTOR: Excuse me, if he knows he can answer it.
"THE COURT: Just a moment.
"DEFENSE COUNSEL: I object to that, your Honor.
"THE COURT: Objection is overruled.
"PROSECUTOR: Is that true?
"A. Unequivocally no, and I take affront to your insinuation that I have been charged with perjury or that I am a perjurer.
"Q. I didn't ask if you were charged. You were investigated by, as a matter of fact.
"DEFENSE COUNSEL: Objection. This—your Honor, if this man has been accused of perjury that is one thing, but to have the innuendoes and the inferences that he has been investigated for perjury, that is unfair, that is improper cross-examination, and I think Counsel knows it, and I object very strenuously to that.
"PROSECUTOR: Excuse me, your Honor.
"THE COURT: What is your question?
"PROSECUTOR: My question is you were investigated for commission of perjury at

association procedures, this "started a process of in-house investigation," he had decided to resign from the association.[11]

The prosecutor was relentless.

Question: "Were you qualified as an expert in the John Lindley Frazier case?"[12]

Answer: "Yes."

Question: "At the termination of your testimony in that case, your testimony was stricken, isn't that right?"

Defense counsel objected. The trial judge recessed the jury and conducted an *in camera* conference to consider the objection. The prosecutor stated that in the Frazier case, the witness' testimony had been stricken on motion of the defense attorney who had called him "because he got caught in an incredible lie." Again, the prosecutor as-

---

the John Lindley Frazier trial, and this goes back to the California Association of Criminalists. People will make an offer of proof. The offer of proof is as follows:

"DEFENSE COUNSEL: Well, let's take it at the bench and see what we are doing.

"THE COURT: Bring it up here, Counsel.

"
   .       .       .       .       .       .       .       .       .       .       .       .       .       .

DEFENSE COUNSEL: May we have, then, your Honor, all the—everything stricken as to the perjury?

"PROSECUTOR: Then let's go back to the bench. This is inappropriate and—you know if you want to discuss it from here, I would just as soon discuss it from out here, too. Your Honor, you tell us.

"THE COURT: Counsel, you will make no further pursuant [*sic*] of the line of questioning you most recently engaged in.

"PROSECUTOR: I am not asking to go beyond—

"THE COURT: That is the order of the Court.

"DEFENSE COUNSEL: Excuse me, your Honor. My motion was to strike the questions regarding perjury of this witness.

"THE COURT: Those questions may be stricken.

"DEFENSE COUNSEL: Thank you, sir."

(The names of the defense counsel and the prosecutor have been deleted and the words "Defense Counsel" and "Prosecutor" substituted therefor.)

[11]We do not know why defense counsel did not interpose an objection. It may be that as a matter of trial tactics he felt that so much had been insinuated by the prosecution's questions that it would be better if the witness answered.

[12]The Frazier case was a particularly notorious multiple murder case that occurred in Santa Cruz County in 1970, and was tried in San Mateo County. (See *Frazier* v. *Superior Court* (1971) 5 Cal.3d 287 [95 Cal.Rptr. 798, 486 P.2d 694].)

serted that the witness was disqualified from testifying in Santa Cruz or San Mateo Counties (it is not clear whether it was in one or the other or both counties), not because the witness was unqualified as an expert, but because "he was patently unbelievable." The trial court repeatedly asked the prosecutor for authority for the admission of such evidence of the witness' "unbelievability." The prosecutor said that he had none but would look for it.[13]

At this point, defense counsel moved for a mistrial. The court denied the motion. Thereafter, court was reconvened and the court admonished the jury in terms of CALJIC No. 1.02 ("Statements of Counsel—Evidence Stricken Out—Insinuations of Questions—Stipulated Facts").

The prosecutor was not content to rest with his cross-examination of the expert. In his argument to the jury, the prosecutor narrated, without objection, the following: "Ever heard of an organization called the California Organization [sic] of Criminalists?" "Yes, I have. I have been a member and a past officer." "Are you a member now?" "No." "Why not?" "I resigned." "Why did you resign?" "Well, they were having an ethics investigation." A few moments later, still addressing the jury, the prosecutor reached the apogee of his overweening zeal for a conviction, remarking, "If [the witness] . . . did with his body what he does with his credentials, San Jose Vice would have him arrested on the spot. He sells credentials for $50 an hour . . . ." "I submit to you [the witness] is a habitual and chronic liar."[14]

It is manifest from the record that the prosecutor was doing his utmost to discredit the defense expert by fair means or foul and that the prosecutor was not being discriminating as to which means he employed.

■ The reference to alleged perjury committed by the witness testifying in the Frazier trial was clearly misconduct. Nor was the reference made once as respondent suggests. When the trial court struck the mat-

---

[13]The prosecutor never did supply the court with any purported authority.

[14]As an illustration of this allegation, the prosecutor cited an inconsistency between the testimony of the witness in this case and his testimony in another some three years earlier. The inconsistency between whether Valium is a "minor tranquilizer" or is "not a tranquilizer per se" but is "used as a tranquilizer" or "can give a tranquilized effect" surely does not reach the level of so opprobrious an epithet as "habitual and chronic liar."

ter relating to perjury (see fn. 10), the prosecutor returned to the same subject via a different route. He asked the witness if he had testified as an expert in the Frazier case and then he asked "at the termination of your testimony in that case, your testimony was stricken, isn't that right?" The insinuation of the question was that the testimony had been stricken because the witness had committed perjury. The insinuation was there because the prosecutor had already suggested that there had been an ethics investigation of the witness by the California Association of Criminalists based on charges that the witness had committed perjury in the Frazier case. Finally, in his argument to the jury, the prosecutor again referred to the "ethics investigation" characterizing the witness as an habitual liar, a person who prostituted his credentials for $50 an hour.

Respondent concedes, and we agree, that the questioning regarding perjury was misconduct, but contends that the error was not prejudicial. It was not prejudicial, the argument goes, because (a) it was only one question in a very lengthy cross-examination and trial, (b) the witness denied there had been any perjury, and (c) the witness had been so discredited during the cross-examination that he was "incredible."

It is true that the witness denied that he had committed perjury in testifying in the past. It is, however, misleading, as we have noted, to state that the question regarding perjury was "one improper question" in the course of a lengthy trial (10 days). Further, the entire defense of McGreen was diminished capacity based on the effect of his ingestion of alcoholic beverages and a drug. The expert was the essential witness as to that effect. In considerable measure, the key to the defense was the credibility of its expert. What could be more damaging to that credibility than questions that represented that the expert had perjured himself in another case wherein he had testified as an expert and had his testimony stricken?

We have examined the record of the entire cross-examination of the expert. We cannot agree with respondent that the expert, as such, or his testimony was "incredible." It appears to be true that the expert was not facile in simple arithmetical skills (in a trial some seven or eight years earlier, he had difficulty in calculating his age and he demonstrated a similar lack of capacity in a different context in the case at bench). It is also true that there were certain inconsistencies in his testimony on direct and cross-examination, but those inconsistencies related to inconsequential details. From the record, the witness may not appear to be

the most impressive of experts but that is a far cry from saying that he was "incredible."

### C. *Brigham Error—*
### *The Definition of "Moral Certainty"*

The court instructed the jury, upon the request of the prosecution, according to a modified version of CALJIC No. 2.90 (3d ed. 1970) which included not only the definition of reasonable doubt specified by Penal Code section 1096 but also the so-called definition of "moral certainty" which was contained in former CALJIC No. 22 (rev.) and which was derived from former Code of Civil Procedure section 1826.[15]

Subsequent to the trial herein, the Supreme Court in *People* v. *Brigham* (1979) 25 Cal.3d 283, 290-292 [157 Cal.Rptr. 905, 599 P.2d 100], held that CALJIC No. 22 (rev.) diluted the standard of proof beyond a reasonable doubt and therefore it was error to so instruct. The court held that its ruling applied to all cases not final. The court further held that the prejudicial effect of the error was to be measured by the test enunciated in *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], i.e., is it reasonably probable that a result more favorable to appellant would have been reached in the absence of the error?

Grudgingly, respondent concedes that *Brigham* error occurred in this case.

### D. *Should the Convictions be Reversed?*

We hold that all three convictions must be reversed.

We are of the opinion that the cross-examination of the defense's expert witness, as noted above, and the inflammatory rhetoric of the prosecutor in his argument to the jury severely prejudiced appellant. We are aware that defendant did not object to the prosecutor's remarks but having been said to the jury in such indelible language, we do not conceive that an admonition by the court could have erased it.

---

[15]The language in question is as follows: "The law does not require demonstration or that degree of proof which, excluding all possibility of error, produces absolute certainty, for such degree of proof is rarely possible. Moral certainty only is required, which is that degree of proof which produces conviction in an unprejudiced mind."

The prosecutor's misconduct, coupled with the *Brigham* error, leads us to believe that it is reasonably probable that but for the errors a more favorable result to appellant would have resulted.[16]

However, with respect to count I, the robbery, it cannot be disputed that the evidence is overwhelming that appellant committed the lesser included offense of assault with a deadly weapon. Diminished capacity is not a defense to such a charge; thus, the prejudicial misconduct of the prosecutor is not relevant thereto.

## *Appellant Race*

A. ■ *Were the statements made by appellant during a police interrogation and used to impeach him at trial obtained in violation of Race's Miranda rights?*

After his arrest, Race was interrogated by a police officer. The interrogation was tape recorded. It begins with the officer telling Race that McGreen is not "going to make it" and that what happens to him depends on what happens to McGreen. Some routine questions are asked of Race, and then he is advised of his *Miranda* rights, which he indicates he understands. The critical part of the interrogation follows:

"Q: Okay. Having these rights in mind, do you want to talk to me tonight about what allegedly happened, your side of the story or whatever?

"Q: I can't pick up a head shake.

"A: Why?

"Q: Because this doesn't pick up a head shake.

"A: No.

"Q: You don't want to talk to me about it?

"A: Yeah, I'll talk to you about it. Well, what do you want to know?

---

[16]We need not discuss whether the failure to instruct on the lesser included offense to count I was reversible error.

"Q: I just want to know if you would give up your rights so that I can ask you questions and that if you will respond to those questions.

"A: I don't give my—give up my rights as a citizen...

"Q. No, I understand. Okay. I guess my question is if I ask you questions regarding what happened tonight with you and your friend, will you answer them, or some of them anyway?

"A: Yeah."

(We have numbered the lines for ready reference.)

Race contends that (a) the interrogation should have ceased when Race indicated (by shaking his head, by saying "No," and by saying "I don't...give up my rights as a citizen") that he did not want to talk to the interrogating officer; (b) the waiver of rights, if there was one, was involuntary because obtained by an impermissible "softening up" technique; and (c) the waiver and statement were obtained by means of deception.

Appellant's latter contentions ((b) and (c)) were not raised in the trial court and were therefore waived. (*People* v. *Rogers* (1978) 21 Cal.3d 542, 547-548 [146 Cal.Rptr. 732, 579 P.2d 1048]; *People* v. *Burden* (1977) 72 Cal.App.3d 603, 614 [140 Cal.Rptr. 282].)

The principles relating to appellant's first contention are clear. Their application to the facts are not.

*Miranda* v. *Arizona* (1966) 384 U.S. 436, 473-474 [16 L.Ed.2d 694, 723, 86 S.Ct. 1602, 10 A.L.R.3d 974] held that "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." (Accord *People* v. *Pettingill* (1978) 21 Cal.3d 231, 237 [145 Cal.Rptr. 861, 578 P.2d 108]; *People* v. *Burton* (1971) 6 Cal.3d 375, 384 [99 Cal.Rptr. 1, 491 P.2d 793]; *People* v. *Randall* (1970) 1 Cal.3d 948, 954 [83 Cal.Rptr. 658, 464 P.2d 114]; *People* v. *Fioritto* (1968) 68 Cal.2d 714, 719 [68 Cal.Rptr. 817, 441 P.2d 625].)

*People* v. *Turnage* (1975) 45 Cal.App.3d 201, 211 [119 Cal.Rptr. 237] held that the case law *"permits clarifying questions* with regard to the individual's comprehension of his constitutional rights or the waiver of them; on the other hand, it *prohibits substantive questions* which portend to develop the facts under investigation (*People* v. *Smith* [(1969) 270 Cal.App.2d 715 [76 Cal.Rptr. 53)] at p. 722; *United States* v. *Nielsen* (7th Cir. 1968) 392 F.2d 849, 852-853)." (See also *People* v. *Watson* (1977) 75 Cal.App.3d 384, 395 [142 Cal.Rptr. 134]; *People* v. *Rice* (1971) 16 Cal.App.3d 337, 343 [94 Cal.Rptr. 4].) However, "just as *Miranda* prohibits continued police interrogation into the substantive crime after a clear indication that a suspect wants an attorney present, it also prohibits continued police efforts to extract from a suspect a waiver of his rights to have an attorney present after a clear indication that the suspect desires such an attorney" (*People* v. *Enriquez* (1977) 19 Cal.3d 221, 238 [137 Cal.Rptr. 171, 561 P.2d 261], and see pp. 231-233, fn. 3)—or, it may be added, that he desires to remain silent.

Appellant's head shake, occurring between lines 3 and 4 of the above portion of the transcript, was a negative response to the request for a waiver of rights. But it was not inappropriate for the officer, who was making a tape-recorded record, to ask appellant to verbalize his response. A reasonable interpretation of the "No" which appellant uttered at line 7 is just such a verbalization. On the other hand, at that point, appellant's "No" was not responsive because the officer had not asked any question. In any case, the officer's further question at line 8 was "clarifying," not "substantive," in the sense stated by *Turnage*. Race's response at lines 9-10 was unequivocally a waiver of his rights. At this point, appellant had invoked and then waived his rights. Commendably, instead of proceeding with a substantive interrogation, the officer sought at lines 11-12 to assure himself that appellant waived his rights. Appellant introduced some uncertainty at lines 14-15 by saying that he did not give up his rights as a citizen. We do not know what he meant but it is probable that he wanted to make it clear that he was not making a carte blanche waiver of his rights. Clarification was, in any case, required and the officer sought it at lines 16-19. Appellant stated at line 20 that he would waive his right to remain silent as to some questions. He proceeded to answer some and eventually asserted his right, at which point the questioning ceased.

We conclude that Race was not "subjected to a continued pressure to waive his rights" (*People* v. *Enriquez, supra,* at p. 238), such as would

"operate...to overcome free choice in producing a statement...." (*Miranda* v. *Arizona, supra,* at p. 474.)

B. *Whether knowledge is a necessary element of vicarious liability, under Penal Code section 12022, subdivision (a), for a coprincipal's being armed with a firearm.*

Race contends that it was error for the trial court to have failed to instruct the jury that an essential element of liability for increased punishment under Penal Code section 12022, subdivision (a) on account of a coprincipal's being armed with a firearm is knowledge that the co-principal is so armed.

Penal Code section 12022, subdivisions (a) and (b) provide:"(a) Any person who is armed with a firearm in the commission or attempted commission of a felony shall, upon conviction of such felony or attempted felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he has been convicted, be punished by an additional term of one year, unless such arming is an element of the offense of which he was convicted. This additional term shall apply to any person who is a principal in the commission or attempted commission of a felony if one or more of the principals is armed with a firearm, whether or not such person is personally armed with a firearm.

"(b) Any person who personally uses a deadly or dangerous weapon in the commission or attempted commission of a felony shall, upon conviction of such felony or attempted felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he has been convicted, be punished by an additional term of one year, unless use of a deadly or dangerous weapon is an element of the offense of which he was convicted."

That language replaced, as of July 1, 1977, a provision which was adopted but never went into effect and which would have provided for a one-year enhancement only for a defendant *personally* armed with a deadly weapon. (Stats. 1976, ch. 1139, § 304.) That never-operative language replaced a provision for a five-to-ten-year enhancement of the term of a defendant who was armed with a deadly weapon, which provision had been authoritatively construed as applying only to being *personally* armed. (*People* v. *Hicks* (1971) 4 Cal.3d 757, 766, fn. 4 [94

Cal.Rptr. 393, 484 P.2d 65]; *People* v. *Snyder* (1969) 276 Cal.App.2d 520, 526-527 [80 Cal.Rptr. 822].)

While the history of section 12022 does not directly resolve the issue, we believe it does afford a clue as to the legislative intent.

Prior to July 1, 1977, section 12022 provided for drastic punishment of not less than five, nor more than ten years, consecutive time for one committing a felony armed with a deadly weapon, as defined in former section 3024, subdivision (b), which included a whole range of weapons. But the liability was personal; it only inured to the person actually carrying the weapon. With the oncoming of the determinate sentencing law, the first amendment to section 12022, enacted though never operative, retained the "deadly weapon" phrase and specifically limited the punishment to the defendant *personally* armed. The final and effective version of section 12022 distinguishes between being armed with a firearm (§ 12022, subd. (a)) and using a deadly or dangerous weapon (§ 12022, subd. (b)). In the former, the additional punishment is specifically made applicable to all principals in the commission of a felony whether or not *personally* armed so long as one principal was so armed. In the latter, the additional punishment of one year was made applicable only to the individual who *personally* used the dangerous or deadly weapon in the commission of a felony.

We take it that the legislative distinction between being armed with a firearm and using a dangerous or deadly weapon reflects a legislative determination that firearms in the *possession* of a person committing a felony present such a physical threat that all principals in the commission of the felony shall suffer the additional one-year punishment, whereas the possession of dangerous weapons other than firearms is not subject to the additional punishment, only the actual use is punished additionally and that punishment is only upon the actual user.

This distinction between possession and use was carried further in section 12022.5 wherein the user, and only the user, of a firearm in the commission of a felony suffers an additional penalty of two years' imprisonment.

In light of the legislative scheme, we do not believe that the Legislature intended to impose a scienter burden upon the prosecution to prove that a principal knew or should have known that his confederate in the

commission of a felony was carrying a firearm. Certainly, if the Legislature had so intended, it could have said so.

C. *The sufficiency of the evidence to support the conviction of attempted robbery and attempted burglary.*

We have examined the record carefully. The evidence against Race was not overwhelming. On the other hand, we cannot say that in the light of the whole record, beyond a reasonable doubt, a rational trier of fact could not have reached the verdicts that were reached here. No more is needed to sustain the judgment. (*Jackson* v. *Virginia* (1979) 443 U.S. 307 [61 L.Ed.2d 560, 99 S.Ct. 2781]; *People* v. *Bassett* (1968) 69 Cal.2d 122 [70 Cal.Rptr. 193, 443 P.2d 777].)

D. *The Brigham error.*

■ We have heretofore recited in connection with appellant McGreen that *Brigham* error (*People* v. *Brigham, supra,* 25 Cal.3d 283) was committed. Of course, the same error was committed with respect to appellant Race.

Were the error reversible under the test of *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065], as we have suggested elsewhere (see *People* v. *McCullough* (1979) 100 Cal.App.3d 169, 182-183 [160 Cal.Rptr. 831]), we could not say that beyond a reasonable doubt the error was harmless. But we are bound by *Brigham's* holding that the touchstone is whether it is reasonably probable that a result more favorable to appellant could have been reached in the absence of error. Applying that criterion, we find no reversible error.

E. ■ *The trial court's failure to state reasons for imposing the arming enhancement.*

Penal Code section 1170, subdivision (c) provides that "The court shall state the reasons for its sentence choice on the record at the time of sentencing...." Rule 405(f), California Rules of Court, defines "sentence choice" as "the selection of any disposition of the case which does not amount to a dismissal, acquittal, or grant of a new trial...." From the foregoing, it would seem that, because the court has the power to impose or to strike an arming enhancement, the imposition of an enhancement is a selection of one of several possible dispositions of a

case and is thus a "sentence choice" for which a statement of reasons is required. Race so contends. We disagree.

Penal Code section 1170, subdivision (a)(2) provides that ". . . The court, unless it determines that there are circumstances in mitigation of the punishment prescribed, shall also impose any other term which it is required by law to impose as an additional term . . . ." Section 1170.1, subdivision (c) provides that "When the court imposes a prison sentence for a felony pursuant to Section 1170 the court shall also impose the additional terms provided in Sections . . . 12022 . . ., unless the additional punishment therefor is stricken pursuant to subdivision (g) . . . ." Section 1170.1, subdivision (g) states that "Notwithstanding any other provision of law, the court may strike the additional punishment for the enhancements provided in Sections . . . 12022 . . . if it determines that there are circumstances in mitigation of the additional punishment and states on the record its reasons for striking the additional punishment." These two subdivisions, read together, persuade us that the imposition of the enhancement is the "rule" for which no reason need be stated, but the striking of the enhancement, being the "exception," requires a statement of reasons.

## F.   *Good time/work time credit.*

Race spent 140 days in county jail. He is entitled to good time/work time credit, if he earned it. (*People* v. *Sage* (1980) 26 Cal.3d 498 [162 Cal.Rptr. 450, 606 P.2d 757].) It is not necessary, however, to remand for sentencing to determine the additional credit to which appellant may be entitled but rather the Department of Corrections may, administratively, establish a procedure whereby such additional credit may be ascertained and credited. (*Ibid.*)

As to appellant McGreen, the judgment is reversed as to all three counts provided that the trial court shall enter judgment finding the said appellant guilty of assault with a deadly weapon, Penal Code section 245, subdivision (a) as a lesser included offense to count I with a use enhancement, unless within 10 days of receipt of the remittitur herein by the trial court, the People elect to retry appellant on count I as charged.

As to appellant Race, the judgment is affirmed.

White, P. J., concurred.

**SCOTT, J.**—I dissent from the reversal as to appellant McGreen.

The majority reasons (1) that simple assault is a necessarily included offense of robbery; (2) that the allegation that McGreen used a firearm in the commission of the robbery is a part of the robbery charge; and (3) that the "use" allegation is part of the "specific language of the accusatory pleading." The majority concludes that the charge of robbery with a use allegation encompasses the offense of assault with a deadly weapon, and that the trial court erred in failing to instruct *sua sponte* on this necessarily included offense. The majority expressly disagrees with *People v. Orr* (1974) 43 Cal.App.3d 666 [117 Cal.Rptr. 738] and its progeny, which hold that a firearm use allegation under Penal Code section 12022.5 is not to be considered in determining whether the accusation includes a lesser included offense as pleaded. (*People v. Benjamin* (1975) 52 Cal.App.3d 63, 71-72 [124 Cal.Rptr. 799]; *People v. Wilson* (1976) 62 Cal.App.3d 370, 374 [132 Cal.Rptr. 813]; *People v. Salas* (1978) 77 Cal.App.3d 600, 607 [143 Cal.Rptr. 755]; *People v. Cole* (1979) 94 Cal.App.3d 854, 861-862 [155 Cal.Rptr. 892].)

The majority has articulated a thoughtful and compelling criticism of *Orr* and its descendants. The *Orr* court characterizes its holding as a "logical consequence" of the rule in *People v. Henry* (1970) 14 Cal.App.3d 89 [91 Cal.Rptr. 841]. (*Orr, supra,* 43 Cal.App.3d at p. 673.) However, as the majority points out, *Henry* does not provide a solid logical foundation for the holding of the *Orr* court. A lesser offense is "necessarily included" if it is within the offense specifically and factually charged in the accusatory pleading; the rationale for that rule is that such a pleading thereby puts the defendant on notice that he must be prepared to defend against evidence showing elements of the lesser offense. (*People v. Marshall* (1957) 48 Cal.2d 394, 405 [309 P.2d 456].) Neither *Orr* nor cases following it discuss the applicability of that rationale to a pleading charging an offense and a use allegation, and such a pleading unquestionably informs a defendant that he must defend against evidence as to all allegations raised therein.

Nevertheless, I disagree with the majority's conclusion that it was error for this trial court not to instruct on its own motion on assault with a deadly weapon.

The principles governing the duty to instruct *sua sponte* in a criminal case have often been repeated. Even in the absence of a request, the trial court must instruct on the general principles of law relevant to the

issues raised by the evidence. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913].) "'The most rational interpretation of the phrase "general principles of law governing the case" would seem to be as those principles of law *commonly* or closely and openly connected with the facts of the case before the court.' [Citations.]" (*People* v. *Flannel* (1979) 25 Cal.3d 668, 681 [160 Cal.Rptr. 84, 603 P.2d 1], italics in original.)

The *sua sponte* rule is designed to "promote the ends of justice by providing some judicial safeguards for defendants from the possible vagaries of ineptness of counsel under the adversary system. Yet the trial court cannot be required to anticipate every possible theory that may fit the facts of the case before it and instruct the jury accordingly." (*Flannel, supra*, 25 Cal.3d at p. 683.) Finally, "the duty of the trial court involves percipience—not omniscience." (*People* v. *Cram* (1970) 12 Cal.App.3d 37, 41 [90 Cal.Rptr. 393].)

In *Flannel* a defendant argued that the trial court erred in failing to instruct the jury *sua sponte* that his honest but unreasonable belief that he must defend himself from deadly attack negates malice, so that the offense is reduced from murder to manslaughter. The Supreme Court concluded that although that unreasonable belief doctrine was an extant legal doctrine, it was unique, seldom applicable, and had never been given full substantive discussion by courts. The court held that in cases *not yet tried*, a *sua sponte* instruction on that doctrine would be necessary when other *sua sponte* instruction requirements were met. However, the court concluded that prior to its decision, this inadequately developed doctrine did not express a "general principle of law" presented by the evidence. Therefore, the trial court's failure to give an instruction on that principle was not error.

A conclusion that the trial court did not err in this case seems equally warranted, if not more so. In *Flannel* the principle in question was at least an existing legal doctrine, albeit one never given full discussion. Here, however, an unbroken line of authority, including at least one case in which hearing was denied by the Supreme Court (*People* v. *Salas, supra*, 77 Cal.App.3d 600), declared that a use allegation was not to be considered in determining necessarily included offenses as pleaded. While one Court of Appeal may decline to follow the prior decisions of another district or division (see *McGlothlen* v. *Department of Motor Vehicles* (1977) 71 Cal.App.3d 1005, 1017 [140 Cal.Rptr. 168]), trial courts are bound by decisions of the Courts of Appeal. (*Auto Equity*

*Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) Furthermore, although the Supreme Court's denial of hearing is not to be regarded as expressing approval of the propositions of law set forth in a Court of Appeal opinion, "it does not follow that such denial is without significance as to the views of the members of that court." (*McGlothlen, supra,* 71 Cal.App.3d at p. 1017, citing *DiGenova* v. *State Board of Education* (1962) 57 Cal.2d 167, 178 [18 Cal.Rptr. 369, 367 P.2d 865], and 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, §§ 669-670, pp. 4581-4584.) Accordingly, until today's decision, an assault with a deadly weapon instruction because of a use allegation would be improper. As a consequence, even if the majority's criticism of *Orr* and the cases which follow it is correct, I cannot agree that the rule which the majority draws from its analysis was a "general principle of law" triggering the trial court's *sua sponte* obligation.

Given the majority's conclusion that the court erred in this case, trial courts will now be faced with conflicting rules as to their obligations under similar circumstances. Not percipience, but prescience will be required, until the matter is definitively resolved by the Supreme Court. The better practice under these circumstances is for the Court of Appeal to follow the established rule, set forth its criticism, and invite the Supreme Court to resolve the conflict. Hopefully, the Supreme Court would, if it followed the majority's rationale, make its rule prospective to actions not yet tried.

I also disagree with the majority's conclusion that the prosecutor's questions and insinuations regarding perjury amounted to prejudicial misconduct.

The testimony of the expert consumes almost 200 pages: he was examined, voir dired, cross-examined, reexamined, and recrossed twice. During this testimony, he (1) admitted that during an earlier trial, he gave his age as 32, corrected himself after realizing he had miscalculated, but then miscalculated again before finally accurately stating that he was 36; (2) explained that confusion as an attempt to clarify an exchange at yet another prior trial, then admitted this explanation was incorrect; (3) had difficulty calculating the number of ounces in a fifth of vodka; (4) admitted he "embellished" his credentials, both at a prior trial and at this trial (by which he meant he presented them in "a pleasing way"); (5) admitted he had testified inconsistently in this case and another as to whether Valium was a tranquilizer per se; (6) misspelled Valium; (7) testified variously that he

didn't know how many times he'd talked to appellant's counsel prior to trial, and that they had talked about 10 times.* Appellant's own counsel recognized the potentially devastating impact of all of the above on the credibility of this witness, and in his closing argument attempted to minimize these details as "collateral trees." Despite counsel's effort to isolate these details as merely collateral, they unquestionably must have impaired the believability and effectiveness of all of this witness' testimony.

Moreover, certain of his substantive testimony was less than persuasive. For example, after considerable testimony about the significance of various levels of blood alcohol, "zones of unconsciousness," and the synergistic effect of alcohol and Valium, he was unable to satisfactorily respond to a hypothetical question by the prosecutor as to how a shorter alcohol consumption time would alter the blood alcohol level of an individual of appellant's size. He then could not, or would not answer the most rudimentary questions: "Q. . . . Is the difference between 12:00 and 2:30 two and a half hours? That is all you have to answer. Yes or no. A. I don't know. Q. Can you count it on your fingers? 12:00 to 1:00 is one hour; is that fair to say? A. I don't have an opinion on that question." Describing this last exchange in his closing argument, appellant's own counsel told the jury that there was a simple answer to the hypothetical question, but that instead "I saw a man get all confused, apparently so upset at something that he wasn't even thinking clearly."

I would conclude that this witness was incredible, not because of the prosecutor's objectionable remarks, but because of the expert's own admittedly inconsistent, inaccurate, and sometimes confusing testimony.

Finally, the *Brigham* error, standing alone, was not reversible error in this case.

I would affirm appellant McGreen's conviction.

Petitions for a rehearing were denied July 25, 1980. Scott, J., was of the opinion that the petitions should be granted. The petitions of appellant Race and respondent for a hearing by the Supreme Court were denied August 21, 1980. Clark, J., was of the opinion that the petitions should be granted.

---

*While mathematical miscalculations might seem inconsequential, this witness was presented as an experienced forensic toxicologist and criminalist. He testified that among his special skills were those analytic skills involved in "forensic alcohol," which he described as the determination of blood alcohol levels and their effect, and courtroom work explaining such data. His arithmetic difficulties loom larger in this context.