Filed 8/17/21  P. v. Bobadilla CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>AARON ALMUNA BOBADILLA,<br><br>    Defendant and Appellant. | B305336<br><br>(Los Angeles County<br>Super. Ct. No. PA090118) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Hilleri G. Merritt, Judge.  Affirmed.

Ellen M. Matsumoto, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Viet H. Nguyen, Deputy Attorney General, for Plaintiff and Respondent.

_____

A jury found Aaron Almuna Bobadilla guilty on two counts of attempted willful, deliberate and premeditated murder, two counts of shooting at an inhabited dwelling and two counts of assault with a firearm. On appeal Bobadilla contends he did not knowingly and voluntarily waive his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) before being questioned by police officers following his arrest and his incriminating statements to them should have been suppressed. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *The Information*

An information filed December 24, 2018 charged Bobadilla with the attempted willful, deliberate and premeditated murder of Mario O. and Paola L. (Pen. Code, §§ 187 subd. (a), 664),[1] two counts of shooting at an inhabited dwelling (§ 246) and two counts of assault with a firearm (§ 245, subd. (a)(2)). As to the attempted murder count involving Mario and one of the two shooting-at-an-inhabited-dwelling counts, the information specially alleged Bobadilla had personally used and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subds. (b)-(d)) and had personally inflicted great bodily injury on Mario (§ 12022.7, subd. (a)). The information specially alleged with respect to the attempted murder count involving Paola that Bobadilla had personally used and intentionally discharged a firearm (§ 12022.53, subds. (b)-(c)). As to the second shooting-at-an-inhabited-dwelling count and the two aggravated assault counts, the information specially alleged Bobadilla had

---

[1] Statutory references are to this code.

2

personally used a firearm (§ 12022.5, subd. (a)). Bobadilla pleaded not guilty and denied the special allegations.

2. *The Evidence at Trial*

Bobadilla and Paola had been in an intimate relationship for three years, which began when they lived in Chile. They came together to the United States and lived in a house on Parthenia Street, Northridge. The couple had problems stemming from Bobadilla's alcoholism. Bobadilla would insult Paola and threaten to physically harm her. On two or three occasions Bobadilla physically abused Paola. Paola ended their relationship, and Bobadilla moved out of the Parthenia Street house.

Despite their breakup Bobadilla occasionally returned to the house because he stored his motorcycle in the garage. He also attempted to rekindle his relationship with Paola. After Bobadilla sent her insulting text messages, Paola changed her phone number and broke off all contact with Bobadilla. Undeterred, Bobadilla continued to come to the Parthenia Street house in an effort to speak to Paola.

After ending her relationship with Bobadilla, Paola started dating Mario, who moved into the Parthenia Street house.

a. *The first shooting*

On December 22, 2017 Paola and Mario were asleep in her bedroom. At approximately 1:45 a.m. Mario heard an individual banging on the bedroom window and demanding in Spanish that Paola come out and talk. Mario told Paola to stay in the bedroom. Mario heard glass breaking toward the back of the house and saw an individual attempting to gain entry through the broken window. Mario told the intruder to stay out and threw objects to deter him from entering. Mario heard a gunshot

3

and attempted to hide.  He heard another gunshot and felt pain on the right side of his ribcage.

Mario ran to the bedroom and told Paola to call the 911 emergency number, explaining he had been shot.  When Paola, in shock, was unable to react, Mario called Ana Villegas, Paola's mother, who lived next door.  Villegas immediately came over and called the 911 emergency number.  Police officers responded, and Mario was taken to the hospital in an ambulance.

The officers who came to the house questioned Paola and collected evidence.  Two 9-millimeter shell casings and an expended bullet were found outside the house.

b.  *The second shooting*

Villegas remained at the house with Paola, who was frightened by the episode.  The two women lay down in Paola's bedroom, but then both got up to charge Villegas's cell phone.  Approximately 10 minutes after the police had left the residence, another bullet was fired through the bedroom window, hitting the side of the bed where Paola normally slept.  Villegas again called the 911 emergency number.

The police returned approximately five minutes after the second shooting.  Paola told the police she suspected Bobadilla was the shooter, reporting that Bobadilla had previously threatened her and had been physically violent with her.  The officers found another spent 9-millimeter casing underneath the bedroom window and a 9-millimeter bullet lodged between the box spring and mattress on Paola's side of the bed.

c.  *Bobadilla's arrest and interrogation*

The police obtained an arrest warrant for Bobadilla and a search warrant for his residence.  They found a semiautomatic 9-millimeter firearm and ammunition in Bobadilla's home.

Forensic testing revealed the casings collected at the Parthenia Street house had been expended from the gun found in Bobadilla's apartment.

Los Angeles Police Sergeant David Bunch and Detective Lozano[2] interviewed Bobadilla following his arrest. Sergeant Bunch acted as lead; Detective Lozano translated for Bobadilla, a native Spanish speaker. The interview was video and audio recorded. Bobadilla's motion to suppress the interrogation was denied, and the recording was played for the jury.

During the interview Bobadilla told officers he went to the Parthenia Street house at 4:30 or 5:00 o'clock in the morning to see Paola. Bobadilla knocked on the front door, but nobody answered. He then went to the back door and knocked again. Bobadilla said a man screamed at him and he then heard the man say, "Pass me the gun." Bobadilla claimed the man fired two shots at him, so Bobadilla shot back twice in the man's direction. However, Bobadilla insisted he did not aim at anyone directly; he fired in a downward direction, aiming at the wall of the house. He also denied, then admitted, being at the Parthenia Street house on two occasions on the night of the shooting.

d. *Bobadilla's defense*

Testifying in his own defense, Bobadilla said he went to Paola's house on December 22, 2017, intoxicated, to get a television and DVD player for his new apartment. Bobadilla explained he had recently purchased a gun as a deterrent because he believed Paola's new boyfriend was dangerous. Bobadilla brought the gun with him to store in an outside shed at

---

[2]     Detective Lozano's first name is not included in the record.

5

the house where he kept some of his other belongings.  He did not expect to use it.

Bobadilla knocked on the door and then went to Paola's window where he saw two people on the bed.  He told Paola to meet him in the backyard to talk.  Paola was crying, and Mario yelled for a gun.  When Bobadilla reached the back of the house, he saw glass flying and believed someone was shooting at him.  He pulled his gun out but inserted the magazine backward.  He fixed the magazine and fired two shots at the house but was not trying to kill anyone.

Bobadilla immediately went to his apartment, which was five minutes away from Paola's house.  He continued to consume a large amount of alcohol.  Bobadilla then returned to the Parthenia Street house to talk to Villegas to learn what had happened.  The gun was still in his car, and he did not intend to use it.  However, Bobadilla saw Paola and Villegas in Paola's bedroom, and he fired through the window because he was being "stupid."  He denied he aimed at Paola and Villegas and insisted he had intended only to scare them.

3. *The Verdict and Sentence*

The jury found Bobadilla guilty on all six counts and found true each of the special allegations.  The court sentenced Bobadilla to an aggregate indeterminate state prison term of 45 years to life.[3]

---

[3]  Bobadilla's sentence consisted of an indeterminate life term for the attempted premeditated murder of Mario plus 25 years to life for the firearm enhancement and a consecutive indeterminate life term for the attempted premeditated murder of Paola plus 20 years for the firearm enhancement.  The court imposed a concurrent term of five years on one count of shooting at an

## DISCUSSION

1. *Governing Law and Standard of Review*

"As a prophylactic safeguard to protect a suspect's Fifth Amendment privilege against self-incrimination, the United States Supreme Court, in *Miranda*, required law enforcement agencies to advise a suspect, before any custodial law enforcement questioning, that 'he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" (*People v. Martinez* (2010) 47 Cal.4th 911, 947, quoting *Miranda*, *supra*, 384 U.S. at p. 479.) These "*Miranda* admonitions" must be given, and a suspect in custody must knowingly and intelligently waive those rights, before being subjected to either express questioning or its functional equivalent. (*Rhode Island v. Innis* (1980) 446 U.S. 291, 300-301; accord, *People v. Flores* (2020) 9 Cal.5th 371, 417 (*Flores*); see *People v. Krebs* (2019) 8 Cal.5th 265, 299 ["We begin with the uncontroverted premise that statements made by a defendant subject to custodial interrogation are inadmissible (for certain purposes) unless the defendant was 'warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.' [Citations.] 'The defendant may waive effectuation of these

---

inhabited dwelling and stayed pursuant to section 654 the sentence imposed on the second count, as well as the sentences imposed on the two aggravated assault charges.

7

rights, provided the waiver is made voluntarily, knowingly and intelligently"'].)

"'A valid waiver need not be of predetermined form, but instead must reflect that the suspect in fact knowingly and voluntarily waived the rights delineated in the *Miranda* decision.' [Citation.] 'A suspect's expressed willingness to answer questions after acknowledging an understanding of his or her *Miranda* rights has itself been held sufficient to constitute an implied waiver of such rights.' [Citation.] The critical question with respect to waiver is whether it was knowing and voluntary, which is 'directed at an evaluation of the defendant's state of mind.'" (*Flores, supra*, 9 Cal.5th at p. 417; see *Berghuis v. Thompkins* (2010) 560 U.S. 370, 384 ["[w]here the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent"]; *People v. Cunningham* (2015) 61 Cal.4th 609, 642 ["[i]n general, if a custodial suspect, having heard and understood a full explanation of his or her *Miranda* rights, then makes an uncompelled and uncoerced decision to talk, he or she has thereby knowingly, voluntarily, and intelligently waived them"].)[4]

---

[4] The requirements for a valid waiver of *Miranda* rights differ from the requirements for a valid invocation of rights after an initial waiver. (*Smith v. Illinois* (1984) 469 U.S. 91, 98 ["[i]nvocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together"]; *Flores, supra*, 9 Cal.5th at p. 417.) To be an effective invocation, the suspect's assertion of the right to remain silent or the right to counsel must be plain and unambiguous. (*People v. Martinez, supra,* 47 Cal.4th at p. 948 ["'[i]n order to invoke the Fifth Amendment privilege after it has been waived, and in order to

8

In reviewing a trial court's *Miranda* ruling, we accept the court's resolution of disputed facts and inferences and its evaluations of credibility, if supported by substantial evidence, but independently decide whether the challenged statements were obtained in violation of *Miranda.* (*People v. Suarez* (2020) 10 Cal.5th 116, 158; *People v. Krebs*, *supra*, 8 Cal.5th at p. 299; *People v. Hensley* (2014) 59 Cal.4th 788, 809.)

2. *The Trial Court Did Not Err in Denying Bobadilla's Motion To Suppress His Custodial Statement*

a. *The interrogation*

At the outset of the interview, the detectives introduced themselves, and Bobadilla remarked he had had a "bad day." Sergeant Bunch stated, "Yeah, we'll talk about it." Before proceeding further, Detective Lozano uncuffed Bobadilla and read him his *Miranda* rights. Detective Lozano asked Bobadilla whether he understood each of the rights. Bobadilla replied, "Yes." Detective Lozano then asked, "Do you wanna talk about your bad day now?" According to both the transcript and the

---

halt police questioning after it has begun, the suspect "must *unambiguously*" assert his right to silence'"]; *People v. Stitely* (2005) 35 Cal.4th 514, 535 [same].) The inquiry is an objective one: An assertion of the right to remain silent is ambiguous, and thus not effective, if a "reasonable officer could interpret [the] defendant's statement as" demonstrating an intent other than "terminat[ing] the interrogation." (*People v. Williams* (2010) 49 Cal.4th 405, 434; see *Stitely,* at p. 535 ["It is not enough for a reasonable police officer to understand that the suspect *might* be invoking his rights. [Citation.] Faced with an ambiguous or equivocal statement, law enforcement officers are not required . . . either to ask clarifying questions or to cease questioning altogether"].)

recording, Bobadilla began to answer in Spanish "Yo," which means, "I," and then stopped.  Detective Lozano asked, "Sorry?"  Bobadilla stated, "The thing is I didn't—first off, I don't know what happened in—on the other side, so I can't—I don't know what—what I can talk about, do you understand?"  Detective Lozano replied, "No.  Can you explain that some more?"  Bobadilla continued, "The thing is I can't—I don't know what I can explain if I don't know—first of all you have me separated.  Why am I here?"  Detective Lozano responded they were investigating a weapon.  Bobadilla asked, "Is the weapon [here]?"  Detective Lozano replied, "We have the weapon here at the station.  It's a 9-millimeter gun.  A 9-millimeter, okay?  So what Detective Bunch wants to know is what you did in the morning.  Do you know a lady named Paola?"  The interrogation proceeded, and Bobadilla answered questions about the events surrounding the shooting.

Bobadilla moved to suppress the incriminating statements he made during the interview on the ground there had been a violation of his rights under *Miranda*.  Bobadilla contended he had answered, "No," to the initial question whether he wanted to discuss his "bad day," thereby clearly indicating he did not waive his right to remain silent.  He further argued his body language in the video recording, including lowering his head, was also an indicator he had said, "No," reinforcing the conclusion he had not waived his rights.

The trial court denied Bobadilla's motion to suppress.  The court explained that, even assuming Bobadilla had said, "No" instead of "Yo," his response in context was ambiguous:  "[W]hat Mr. Bobadilla seems to say, he's equivocating.  He's like, 'I don't know what I can talk to you about.  Do you understand.'  He asks

10

the question, which invites the answer. Lozano says, 'No. Can you explain that?' [Bobadilla says,] 'The thing is, I don't know what I can explain if I don't know. First of all, you have me separated. Why am I here?' . . . [H]e's not shutting off the conversation. He's continuing the conversation. . . . So on my reading of this and my understanding of the case law under Miranda, I don't think it's a violation."

   b. *Bobadilla impliedly waived his right to remain silent*

Bobadilla contends he unambiguously indicated he was not waiving his right to remain silent by answering, "No" to Detective Lozano's question whether Bobadilla wanted to talk about his "bad day now." At that point, Bobadilla argues, Detective Lozano and Sergeant Bunch should have immediately terminated the interview; and it was error for the trial court to conclude he had impliedly waived his rights under *Miranda* based on his subsequent equivocal statements about talking to the detectives.

As discussed, the video and transcript reflect Bobadilla said, "Yo," not "No." Even if Bobadilla actually said, "No," however, under the circumstances his answer did not unambiguously signal an intention to exercise his right to remain silent. (See *Flores*, *supra*, 9 Cal.5th at p. 418 ["It is true, as defendant emphasizes, that a 'no' response to a simple question whether the suspect wishes to speak with law enforcement generally constitutes an unambiguous invocation. [Citations.] But here, considered in context, neither the question asked, nor the answer given was this simple—and, as is true with most questions of interpretation, context does matter"]; see also *People v. McGreen* (1980) 107 Cal.App.3d 504, 522 [holding that a head shake, followed by a verbalized "No," was ambiguous in context,

11

so it was permissible for officers to clarify suspect's meaning], disapproved on another ground in *People v. Wolcott* (1983) 34 Cal.3d 92, 98, and cited with approval on *Miranda* point in *Flores*, at p. 420].)  "No" in context here was ambiguous, particularly since Bobadilla was speaking in Spanish because many different words could have followed Bobadilla's statement, such as "No se" ("I do not know"), "No quiero" ("I do not want") and "No entiendo" ("I do not understand").  For this reason, Detective Lozano permissibly asked Bobadilla what he meant. Bobadilla responded he did not know what he could talk about, plainly not an unequivocal assertion of the right to remain silent. (See *People v. Williams, supra,* 49 Cal.4th at p. 434 [finding ambiguous defendant's statement "I don't want to talk about it"]; see also *People v. Wash* (1993) 6 Cal.4th 215, 237-239 [finding ambiguous defendant's statement "I don't know if I wanna talk anymore"].)  Given what can be described at most as a lack of clarity in these initial responses, Bobadilla's subsequent willingness to answer the detectives' questions was properly found by the trial court to constitute an implied waiver of his right to remain silent.  (See *Flores*, at p. 426 ["[b]y willingly answering substantive questions about the crime, defendant impliedly waived his right to remain silent, without any limitation to only background information"]; accord, *People v. Cruz* (2008) 44 Cal.4th 636, 667 [suspect can waive *Miranda* rights impliedly by willingly answering questions after acknowledging an understanding of his rights].)

In *Flores* the defendant had been advised of his *Miranda* rights and participated in a custodial interrogation about homicides committed in San Bernardino County.  The following day a detective from the Los Angeles Police Department (LAPD)

approached Flores, who was still in custody, to speak about a different homicide in Los Angeles County. The Los Angeles detective restated the *Miranda* rights, and Flores indicated he understood them. (*Flores, supra*, 9 Cal.5th. at p. 415.) The detective then said, "'Basically what I'd like to do is talk about the . . . case that we investigated that we got called out on back on November 17th, 2000. Uh I'll tell you how we got called out on it in a minute but uh do you want to take a few minutes to talk a little bit about that?'" Flores responded, "'No'" or "'Nah.'" (*Ibid*.) The detective attempted to clarify Flores's response by explaining he wanted to provide Flores some details about the investigation and get some background from him. The detective emphasized three times that Flores was not required to answer any questions and then asked, "'Do you want to take a few minutes and talk to me about that stuff?'" Flores replied, "'Oh yeah, well whatever.'" (*Id*. at p. 416.) The interview continued, and eventually Flores confessed to killing the victim.

The Supreme Court held no *Miranda* violation had occurred. Based on "case-specific contextual considerations," it was reasonable to ask neutral follow-up questions to ascertain defendant's meaning in response to the detective's question because it was unclear whether the response referred to talking about the case or how they got called out on the case: "[W]e conclude that defendant's '[n]o,' in context, was susceptible of more than one possible interpretation. [The detective] therefore was not forbidden from asking his follow-up question to clarify defendant's intent. We emphasize, as we did in these prior cases, that [the detective's] question was both brief and neutrally phrased and delivered; [the detective] did not in any way badger defendant nor otherwise use coercive tactics to induce a waiver of

his right to remain silent." (*Flores*, *supra*, 9 Cal.5th at pp. 421-422.)

Bobadilla attempts to distinguish *Flores*, arguing that, unlike the LAPD detective in *Flores* who repeatedly reminded the defendant of his right to remain silent, Detective Lozano only gave the *Miranda* admonitions once. Bobadilla further contends Detective Lozano was not attempting to clear up the ambiguity of Bobadilla's "yo" statement, but rather strategically trying to get Bobadilla to waive his rights by posing leading statements to trick him to talk further.

Contrary to Bobadilla's suggestion, neither the holding nor the analysis in *Flores* was dependent on the repeated reminders to the suspect of his right to decline to answer questions. (See *Flores*, *supra*, 9 Cal.5th at 424.) As in *Flores*, Bobadilla's ambiguous statement, in context, was susceptible of more than one possible interpretation. Detective Lozano, presented with an ambiguous response, properly asked a follow-up question to clarify Bobadilla's intent. Bobadilla at first continued to equivocate and then willingly answered questions as the interrogation proceeded. There was no *Miranda* violation.

## DISPOSITION

The judgment is affirmed.

PERLUSS, P. J.

We concur:

FEUER, J.          IBARRA, J.[*]

---

[*]     Judge of the Santa Clara Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14